**GULF COAST FARMERS COOPERA- TIVE, Appellant,**

v.

**VALLEY CO–OP OIL MILL, a Cooperative Corporation, Appellee.**

**No. 1252.**

Court of Civil Appeals of Texas,
Corpus Christi.

Aug. 29, 1978.

Rehearings Denied Oct. 19, 1978.

Harry L. Hall, Morris Atlas, Atlas, Hall, Schwarz, Mills, Gurwitz & Bland, McAllen, for appellant.

James B. Corcoran, Ewers, Toothaker, Ewers, Abbott, Talbot, Hamilton & Jarvis, McAllen, for appellee.

## OPINION

BISSETT, Justice.

This is a suit for damages resulting from an alleged conversion of "stock" in a corporation and from an alleged breach of contract to sell and deliver fertilizer.

Gulf Coast Farmers Cooperative, hereinafter referred to as "Gulf Coast", filed suit against Valley Co-op Oil Mill, hereinafter called "Valco", to recover damages for the alleged conversion of certain shares of Series II and Series IV stock of Mississippi Chemical Corporation, hereinafter designated as "Miscoa", and for damages allegedly sustained by reason of Valco's refusal to deliver fertilizer to it under an allocation previously made by Valco to it. Following a jury trial, Gulf Coast moved for judgment on the verdict and Valco filed a motion for judgment non obstante veredicto. Valco's motion with respect to the action for conversion of the Series II stock was sustained. Judgment was rendered which was favorable to Gulf Coast in the action for conversion insofar as the Series IV stock is concerned, and concerning the Series IV stock and its claims for damages in the action for breach of contract. Gulf Coast and Valco have each perfected an appeal to this Court from those portions of the judgment which were unfavorable to each of them.

This lawsuit involves a dispute as to whether or not Gulf Coast owned certain stock in Miscoa (which was allegedly converted by Valco on March 3, 1975), and as to whether Valco's refusal to deliver agricultural fertilizer to Gulf Coast after March 3, 1975 constituted a breach of a pre-existing contract to sell and deliver certain quantities of fertilizer to Gulf Coast. The precise nature of the "stock" is not made clear by either the pleadings or the evidence. Whatever the true nature of the "stock" in dispute in this lawsuit may be, the issues presented are: 1) did the several letters (hereinafter discussed) between Gulf Coast and Valco, when construed together, constitute an agreement whereby Valco agreed to sell certain Miscoa stock to Gulf Coast?; 2) If so, how many shares of Series II stock, and how many shares of Series IV stock were sold?; 3) Assuming that Gulf Coast did purchase Miscoa stock, after the number of shares of each series is determined, what was the market value of each share of the two series of stock on the day of its conversion, if there was a conversion thereof?; and 4) Was there a breach of a pre-existing contract to sell and deliver fertilizer?

Gulf Coast began purchasing fertilizer from Valco in early May, 1972. Fertilizer

was in short supply in later September, 1973. At that time, Valco was purchasing fertilizer from Miscoa, and Gulf Coast was purchasing it from Valco. Both Gulf Coast and Valco became concerned over the effect that the fertilizer shortage would have upon the existing distribution chain between Valco and Miscoa, which would, of necessity, have a pronounced effect upon Gulf Coast and its patrons under its then existing arrangement with Valco. A number of letters passed between Valco and Gulf Coast in an attempt to negotiate the precise allocation of Nitrogen fertilizer, designated by the parties and referred to herein as "Series II" stock, and Mixed Grade fertilizer, designated by the parties and referred to herein as "Series IV" stock.

Gulf Coast contends that the letters formed a contract between it and Valco, whereby it (Gulf Coast) became the owner of certain shares of Miscoa Series II and Series IV stock. It further contends that the contract also gave it the right to purchase certain amounts of fertilizer for the period July 1, 1974 to June 30, 1975. Valco disputed those claims and asserts that all Gulf Coast acquired was an equity in Valco.

As has been noted, judgment was rendered which was favorable to Gulf Coast with respect to its action for conversion of Miscoa Series IV stock, but the trial judge, concerning the action for conversion of Miscoa Series II stock, granted Valco's motion for judgment non obstante veredicto. The evidence concerning whether or not Gulf Coast purchased Miscoa Series II stock, in all material aspects, is the same as to whether it purchased Miscoa Series IV stock. In that state of the record, we believe that the trial court erred in rendering judgment on the verdict for Gulf Coast as to its action for conversion of Series IV stock and in granting Valco's motion for judgment non obstante veredicto concerning the action for conversion of Series II stock. The judgment further awarded Gulf Coast certain monies for breach of contract, caused by Valco's refusal to sell Gulf Coast its unused portion of the fertilizer allocation

for the period of time in question. In this respect, we believe the trial court was correct. We, therefore, will sever the action for damages for conversion from the action for damages for breach of contract; we will reverse the judgment of the trial court with respect to the action for conversion and will remand that cause to the trial court, but we will affirm such judgment with regard to the action for breach of contract.

Both Gulf Coast and Valco are farmers' cooperative associations established under Tex.Rev.Civ.Stat.Ann. arts. 5737 et seq. Among other things, they furnished fertilizers and chemicals, to both members and non-members, to be used ultimately by farmers. Besides being subject to State statutes, both operate as tax-exempt cooperatives and must comply with federal tax rules and regulations in order to maintain their federal income tax exemption. After deduction of reasonable expenses of operations, cooperatives refund to their patrons all profits in the form of patronage refunds. Patrons usually receive refunds at the end of each of the cooperative's fiscal years either in cash or allocation, giving the patrons equity ownership in the fund allocated. A tax-exempt cooperative may do business with non-members to a limited extent provided both members and non-members are dealt with equally. Here, Valco furnished fertilizer and chemicals to Gulf Coast, a non-member of Valco.

Miscoa is a manufacturer of agricultural fertilizers. Under its charter and by-laws, its stockholders have certain preferred patronage rights which give them the option to purchase fertilizers from it, and in order to obtain an efficient distribution of such products, Miscoa appoints Distributors and Agents to serve such stockholders. It was required that all stockholders of Miscoa be served "alike". On May 9, 1972, a three-party contract was made whereby Miscoa (the "Company") agreed to supply certain agricultural fertilizers to Valco (its "Distributor"), and Gulf Coast (its "Agent"). The fertilizers to be delivered by Miscoa to Valco would be distributed to the stockhold-

ers of Miscoa in accordance with "a list of certain holders" of Miscoa stock to be prepared by Miscoa and attached as exhibits to the contract. It was further provided by the contract that "each exhibit shall contain a statement of the amount of each class of stock owned by each person (hereinafter called 'stockholders') who are to be served by the Agent and Distributor", subject, among other provisions, to the following:

\* \* \* \* \* \*

"Should any stockholder purchase additional stock o (sic) transfer his stock in accordance with the Charter and Bylaws of the Company, or assign his patronage rights in writing and notify th (sic) Company of such purchase, transfer or assignment, or should the Company change the preferred patronage rights of the Stockholders then in either of such events, the Company shall notify the Agent and the Distributor in writing who shall maintain such notice as a supplement to said exhibit and not as a part thereof."

Neither the exhibits, lists, statements, charter or by-laws of Miscoa, referred to in the contract appear in the record. There is no indication that the contract was ever revoked, rescinded or changed in any way.

Gulf Coast apparently contends that its rights to purchase Miscoa stock became fixed by the contract. This is disputed by Valco, which asserts that the said three-party contract, by its terms, only covers a situation where the ultimate consumer of the fertilizer is himself a Miscoa stockholder. Valco further claims that it simply distributed Miscoa products to Gulf Coast. Valco also insists that it was a Miscoa stockholder who sold the fertilizers allocated to it by Miscoa to its (Valco's) members and non-member cooperatives and that it (Valco) purchased the fertilizers from Miscoa, paid Miscoa for it, and charged its members and non-member cooperatives a sufficient price for such fertilizers to make a profit thereon (referred to as "profit margin"), which would eventually be paid to its patrons (members and non-members) by way of cash refunds and allocations to various reserve accounts held by it (Valco) for operating capital.

At all times pertinent to this appeal, Valco served as a distributor of fertilizers for Miscoa. Gulf Coast, who purchased such products from Valco, would pay Valco for the Miscoa products invoiced to them and would then invoice its farmer-patrons, the ultimate consumer of the fertilizers, in accordance with the appropriate allocations. Valco would pay Miscoa for all fertilizers shipped to it by Miscoa. In early May, 1972, Valco commenced selling fertilizers to Gulf Coast as a non-member cooperative. The business continued until March 3, 1975, when Valco informed Gulf Coast that it would no longer furnish fertilizers to it; a settlement statement was furnished, which did not meet with Gulf Coast's approval.

In Gulf Coast's action for conversion of Series II and Series IV Miscoa stock, a recovery was sought as of the date of conversion of the market value of the stock. Gulf Coast asserted such value to be $175 per share for the Series II stock and $80.00 per share for the Series IV stock. It also sought recovery for the market value of the unused portion of its 1974–75 allocation.

The jury found:

(1) Gulf Coast obtained ownership in $5,491.03 Miscoa stock by virtue of the 1972–73 distribution of margins to it, and on March 3, 1975, Valco converted the said stock (Special Issues 1 and 2);

(2) in December of 1973, Valco sold to Gulf Coast $91,460.92 worth of Miscoa stock, and on March 3, 1975, Valco converted the said stock (Special Issues 3 and 4);

(3) Valco acted wrongfully on March 3, 1975, when it refused to sell Gulf Coast the remaining balance of fertilizer theretofore allocated to it for the year 1974–1975 (Special Issue 5);

(4) the market price per ton of nitrogen fertilizer between March 3, 1975, and June 30, 1975, was $163 (Special Issue 6);

(5) on March 3, 1975, Gulf Coast could not have purchased its unused allocation of dry-mixed fertilizer from another source at a price below its sale price (Special Issue 7);

(6) the value per ton to Gulf Coast of dry-mixed fertilizer on March 3, 1975, for bag-mixed was $170 and for mixed bulk was $165 (Special Issue 9).

Gulf Coast did not object to the charge. Valco did so object, and included in its objections are complaints that there is no evidence to support the submission of Special Issues 1, 2, 3 and 4; that Special Issue 5 is confusing and ambiguous; that Special Issue 6 calls for a finding "that does not relate to any justiciable legal theory of damages by reason of limiting the asked for market price to that price below the sales price of Gulf Coast Farmers Cooperative"; and that Special Issue 9 calls for a conclusion from the jury. While Valco also objected to the submission of Special Issue 7, the record does not reflect the ground on which such objection was based.

The judgment, in part, decreed:
" . . . the Plaintiff is entitled to recover the following:

■ $138,266.91, same being the value on March 3, 1975, of 1,819.3015 shares of Series IV Mixed Fertilizer Stock of Mississippi Chemical Corporation . . .

■ $18,907.92, which is the difference between the market price per ton and the price Plaintiff would have had to pay Defendant for the purchase of 393.915 tons of Nitrogen Fertilizer.

■ $3,060.00, being the difference in the price Plaintiff would have had to pay Defendant and the value of same as found by the jury for 90 tons of Mixed Bagged Dry Fertilizer.

■ $32,889.28, which is the difference in the price Plaintiff would have had to pay Defendant and the value of same found by the jury for 843.315 tons of Bulk Mixed Dry Fertilizer.

That part of Plaintiff's Motion for judgment that seeks recovery for $529,951.80 is overruled . . .

\*     \*     \*     \*     \*     \*

Defendant's Motion for Judgment Non Obstante Veredicto is sustained as it relates to the Series II nitrogen stock of Mississippi Chemical Corporation and said Motion for Judgment Non Obstante Veredicto in all other respects is in all things overruled.

It is therefore, ORDERED, ADJUDGED and DECREED that the Plaintiff, GULF COAST FARMERS COOPERATIVE, recover of and from the Defendant, VALLEY CO–OP OIL MILL, the sum of $193,124.11 with interest on the sum of $138,266.91 at the rate of 6% per annum from March 3, 1975 to September 1, 1975, and at the rate of 9% per annum until date of judgment and that interest at the rate of 9% per annum will run from the date of this judgment on all sums awarded Plaintiff herein."

The judgment was signed on April 12, 1977.

Gulf Coast asserts on appeal that the trial court erred in sustaining Valco's motion for judgment non obstante veredicto, and denying recovery for conversion of Series II Miscoa stock for the reasons: 1) there was ample evidence to support the jury's findings; 2) the trial court was without basis for treating Series II and Series IV stock differently and that in so doing the trial court made an erroneous bifurcation or partition of these same jury findings; and 3) the number of shares of Series II stock owned by it as well as the value thereof on the date of conversion was established by uncontroverted evidence and there was no necessity to submit such issues to the jury. Valco contends that jury findings to Special Issues 1 to 4 are not supported by "legally" or "factually sufficient" evidence; that the answers to Issues 7 and 9 "cannot be supported by the evidence"; that the answers to Issues 1 to 4 do not support a judgment for recovery as to Series IV Miscoa stock;

that the jury's answer to Issue 6 amounted to a double recovery of damages; that the alleged conversion did not occur on March 3, 1975; and, if there was a conversion, it occurred in December, 1973, or no later than in May or June of 1974; and that the trial court erred in granting interest on $138,266.91 at the rate of 9% per annum from September 1, 1975 until date of judgment.

Gulf Coast and Valco each pray that this Court affirm those portions of the judgment which are favorable to it and render judgment in its favor as to all portions of the judgment that are unfavorable to it. In the alternative, each requests that this Court sever the action, and affirm all portions of the judgment that are favorable to it and remand that portion of the case which resulted in an unfavorable judgment concerning the affected party to the trial court for a new trial.

There is a fundamental and primary dispute between Gulf Coast and Valco as to what Gulf Coast got by virtue of its investment of $96,951.95 with Valco. It is the contention of Gulf Coast that such, in effect, constituted an investment in cooperative stock of Miscoa, or in an equity in such stock equivalent to a given number of shares therein, which is determined by the allocation contained in the October 13, 1973 letter, hereinafter set out. Valco contends that the investment constituted patronage credits or equities in the Valco Cooperative, and nothing more.

On December 1, 1972, Valco advised Gulf Coast in writing that its Board of Directors had authorized a distribution of margins to its customers for the fiscal year ending September 30, 1972, and that Gulf Coast was entitled to $1,530.40 as "an allocated equity" in Miscoa. Also, on September 19, 1973, Valco sent Gulf Coast a letter which stated that its Board of Directors had authorized a distribution of margins to its customers resulting from distributors' fees received from Miscoa based on fertilizer purchases, and that Gulf Coast had an "allocated equity" in Miscoa in the amount of $3,927.63, as a result thereof.

On October 15, 1973, Mr. Walter Tanamachi, division manager for Valco, sent a letter to the several cooperatives (including Gulf Coast) that were then doing business with Valco. The pertinent parts thereof read:

"There seems to be some confusion and a number of baseless rumors regarding our position on nitrogen fertilizer sales. For your information, on May 22, 1973, our Board of Directors authorized the purchase of an additional $288,000.00 in stock of Mississippi Chemical Corporation to obtain a quota equal to the quantity sold this year.

Regarding distribution of available supplies, we quote a verbatim an extract from the minutes of our Board Meeting of August 28, 1973:

'Chairman Holcomb then reported that the committee had studied the problem of nitrogen fertilizer sales from every angle and had determined in view of a certain shortage that all nitrogen fertilizer sales be allocated to patrons on the basis of last year's purchases.' "

On October 31, 1973, Valco sent another letter to Gulf Coast and advised:

"As most of you already know Valco Chemicals has agreed to buy $288,000.00 worth of Mississippi Chemical Corporation Nitrogen Stocks so that we could assure our customers the same amount of N–Sol–3 and Urea as they bought last year (from July 1 to June 30).

Yesterday our Board of Directors also agreed to buy an additional $117,000.00 worth of mixed grade fertilizer stocks which would enable us to buy 73% of our purchases last year. This means that for the period of July 1, 1973 to June 30, 1974, we will be guaranteed only 73% of the amount of mixed grade fertilizers that we bought from Mississippi Chemical during their last fiscal year. We are allocating to our dealers on the same

basis (73% of their dollar volume purchases) for the period of Miscoa's next fiscal year.

Accordingly these are the allocations for your organization based on instructions from our Board of Directors:

GULF COAST FARMERS CO–OP

MIXED GRADE FERTILIZERS

| '72–'73 SALES | 73% ALLOCATION | PURCHASES —10/29/73 | BALANCE |
|---|---|---|---|
| $155,762.13 | $113,706.35 | $46,323.68 | $67,892.67 |

DRY NITROGEN & N–SOL–32

| '72–'73 SALES | ALLOCATION | PURCHASES —10/29/73 | BALANCE |
|---|---|---|---|
| 1892.685 Tons | 1892.685 Tons | 423.575 Tons | 1469.110 Tons" |

---

In the fertilizer transactions, Valco dealt with both its members and non-member patrons. The Board of Directors of Valco determined that it was necessary to require non-members to make certain investments with it in order to equalize the investment requirements of both members and non-members, and, accordingly, voted to require an investment of $45.00 per ton for each ton of fertilizer allocated to non-members. On November 1, 1973, Tanamachi sent a letter to Gulf Coast advising it of the Board of Directors' action. Tanamachi testified that payment of the required investment would give each non-member a guaranteed allocation of fertilizer, the result of which was to "treat everybody alike". The offering of $45.00 a ton for fertilizer, was later revised, apparently because Miscoa objected to Valco's requirement of an investment in excess of the price of the fertilizer. The Board of Directors for Valco met again on November 27, 1973, and passed a resolution which required "an investment of $32.00 for each ton of nitrogen fertilizer allocated and an investment of $20.00 for each $62.50 worth of mixed grade fertilizer allocated." Tanamachi then prepared and sent a letter to Gulf Coast, dated November 30, 1973, advising it of the Board of Directors' action pertaining to the revised required investment, and further stated therein:

* * * * * *

"The nitrogen and mixed grade fertilizer stocks will be purchased from Mississippi Chemical Corporation by Valley Co-op Oil Mill. You will be issued a letter of equity in our organization for the stock equity we hold on the same basis and cost that we are purchasing this stock provided you exercise your option to take your fertilizer allocations."

* * * * * *

On December 13, 1973, Valco sent a letter to Gulf Coast, stating therein:

* * * * * *

"SUBJECT: Fertilizer Allocations for 1973–74—please refer to our letters to you dated November 1 and November 30, 1973.

When you exercise this option to purchase equity in Mississippi Chemical Corporation stocks held by Valley Co-op Oil Mill, you are not only assuring your self of that amount of fertilizer for this season, but for every year in the future that you retain this equity. We anticipate several years of severe shortages in fertilizer materials and we can reasonably expect this investment to pay for itself in 3 years or less besides assuring you of a supply of fertilizers in the future.

We must have a committment (sic) from you prior to December 31, 1973, so that our fertilizer allocations may be finalized. If you do not choose to exercise this option then we will have to allocate your fertilizer to our equity holders since this stock has already been bought by Valley Co-op Oil Mill."

Gulf Coast, by letter dated December 14, 1973, advised Valco:

"SUBJECT: PURCHASE OF EQUITY IN MISSISSIPPI CHEMICAL CORPORATION STOCKS. REFERENCE: VALCO LETTERS DATED OCTOBER 31, NOVEMBER 30, AND DECEMBER 13, 1973.

Enclosed is a check in the amount of $91,460.92 for the purchase of Mississippi Chemical Corporation nitrogen and mixed fertilizer stock. This stock is to be held in escrow by Valco Chemical Division for Gulf Coast Farmers Cooperative.

Our allocation as stated in your letter of October 31, 1973 is for 1892.685 tons of dry nitrogen and N–Sol–32 and for $113,-706.35 worth of dry mixed grade fertilizers.

Valco Chemical Division presently holds $5,491.03 worth of Mississippi Chemical Corporation stock in escrow for Gulf Coast Farmers Cooperative. This $5,491.03 plus the enclosed check for $91,-460.92 brings our total investment to $96,951.95 which covers our Mississippi Chemical fertilizer allocation for 1973–74."

The check for $91,460.92 was cashed by Valco, and on December 27, 1973, Valco wrote Gulf Coast and stated:

"This will acknowledge receipt of your check in the amount of $91,460.92 for the purchase of stock in Valley Co-op Oil Mill (Agricultural Chemicals Division) and this letter is evidence of an allocated equity in same, which has already been purchased from Mississippi Chemical Company by Valley Co-op Oil Mill for the Chemical Division's patrons."

On June 25, 1974, Miscoa, in a letter to its stockholders advised:

\* \* \* \* \* \*

"1) Since fertilizer is obviously going to be short during the 1974–75 fiscal year, all products will be on strict allocation from Mississippi Chemical. Allocation on stock owned is as follows:

| Products | Type of Stock | Allocation |
|---|---|---|
| \* \* \* \* \* | \* \* \* | \* \* \* \* |
| Nitrogen Products (ANF, Urea, N-Sol or (AA) | Series II | One ton for each 1.68 shares of stock owned |
| \* \* \* \* \* | \* \* \* | \* \* \* \* |
| Mixed Fertilizers | Series IV | One ton for each 1.1 shares of stock owned" |
| \* \* \* \* \* | \* \* \* | \* \* \* \* |

Valco received a copy of the letter. Valco then issued a written allocation to Gulf Coast covering Miscoa's fiscal year, July 1, 1974 to June 30, 1975, as follows:

\* \* \* \* \* \*

"Listed below is your 1974–1975 fertilizer allocation from Mississippi Chemical Corporation:

Gulf Coast Farmers Cooperative
FERTILIZER ALLOCATION—Listed in TONS

| Mixed Grade | Ammonia | Urea | N-Sol-32 | Ammonium Nitrate |
|---|---|---|---|---|
| 1653.910 | NONE | 169.950 | 1672.785 | 49.950" |

\* \* \* \* \* \*

By letter dated May 25, 1973, Valco advised Miscoa that its Board of Directors "voted to pledge our purchase of $288,-000.00 in Nitrogen Series II Capital Stock in Mississippi Chemical Corporation". A check for that amount of money was subsequently sent to Miscoa. In answer to that letter, Miscoa, on May 29, 1973, wrote Valco and stated:

"Thank you very much for your letter of May 25 certifying the commitment of your Board of Directors to purchase $288,000 Series II Mississippi Chemical Corporation stock prior to June 30, 1974. As a result of this action we will set aside this amount of stock out of our current registration to fulfil (sic) the commitment.

The purchase of this additional stock will give you a total allocation of nitrogen products for fiscal 1973–74 as follows:

| | |
|---|---|
| Allocation on stock presently owned: | 2,813 tons |
| Allocation of other stockholders assigned to your distributorship: | 34 |
| Allocation on $288,000 stock to be purchased: | 9,000 |
| Total allocation for fiscal 1973–74: | 11,847 tons" |

On November 19, 1973, Valco, in a letter to Miscoa said:

". . . I am pleased to return our check payable to Miscoa in the amount of $117,000.00 for the purpose outlined on the vouchers."

The "voucher", referred to in the letter, was not introduced in evidence.

By a letter dated December 11, 1973, Miscoa advised Valco:

"We have deposited Valco's check for the purchase of $117,000 additional Series IV stock, and the stock certificate will be mailed sometime later this month or possibly early January. Fertilizer may be purchased against this additional allocation prior to the actual issuance of the stock certificate.

Also, we will continue to make nitrogen shipments against the allocation on the $288,000 Series II stock which Valco has committed to purchase."

The Board of Directors for Valco met on October 30, 1973 and approved purchase of an "additional $117,000 in stock in Mississippi Chemical Corporation in order to obtain the maximum allotment of fertilizer." A field representative of Miscoa was called into the meeting "to outline in detail current and proposed stock ownership" by Valco and the minutes of that meeting reflect that he gave a "detailed analysis". The "detailed analysis" or substance thereof was not introduced into evidence.

On August 21, 1974, Valco sent Gulf Coast a distribution letter for the Miscoa fiscal year ending June 30, 1974. A check accompanied the letter in the amount of $33,752.59 which covered cash distributions by Miscoa as a "100% Mississippi Chem. rebate $22,822.51", and a "30% Chem. Div. margins $10,930.08", constituting a cash distribution of the profits of Valco for that period of time. Pertaining to "allocated equities" in the Chemicals Division, the letter stated as follows:

\* \* \* \* \* \*

"The following distribution is made as allocated equities in the Chemicals Division:

| | |
|---|---|
| Reserve for Contingencies | $ 4,512.32 |
| Allocated Equity Miss. Chem. | $_____ |
| Revolving Equity Chem. Div. | $20,038.49 |
| Total Distribution including cash | $58,303.40" |

\* \* \* \* \* \*

This was the first instance where "Reserve for Contingencies" and "Revolving Equity Chemical Division" accounts had been used.

On March 3, 1975, Valco sent Gulf Coast a letter informing it that Valco could no longer sell agricultural chemicals and fertil-

izers to Gulf Coast. The letter, in part, stated:

\*   \*   \*   \*   \*   \*

"There is currently due $37,404.02 on your account for past fertilizer deliveries, including $552.77 service charge for the month of February. Your firm has Equity Reserve Account balances as follows:

| | |
|---|---|
| Reserve for contingencies | $ 4,512.32 |
| Revolving allocated Equity | 25,529.52 |
| Fertilizer Cash Equity Reserve | 91,460.92 |
| Total Allocated Equitites | $121,502.76 |

Your current account payable is 60 days past due and under our credit agreement is in excess of credit allowance. Because of this we must set off against this current account payable $37,404.02, which amount is drawn from your Special Fertilizer Cash Equity Reserve of $91,460.92, which leaves a balance in this Special Fertilizer Cash Equity Reserve of $54,056.90. The balances in the Reserve for Contingencies Account and Revolving Allocated Equity account are distributable as those funds revolve out in date order, as required by the By-Laws of the Cooperative. As these funds are revolved out of such reserves, they will be distributed to your firm, after setting off against any current account balance due us, depending upon whether there is any current account balance due us at that time."

\*   \*   \*   \*   \*   \*

The minutes of the regular meeting of the Valco Board of Directors on March 25, 1975, reflect that the Board passed a motion to purchase from Miscoa 1,890.151 shares of Series II Stock at a cost of $100 per share, for a total of $189,010.08, covering Ammonium Nitrate and N–Sol–32 only; plus 2,429.911 shares of Series IV Stock at a cost of $75.00 per share, for a total of $182,220.56, covering Dry Mixed fertilizers; the total amount of the investment in two classes of stock purchased amounted to $371,230.64.

In a June 24, 1975 stockholders' meeting the names of several accounts were formally changed: 1) "allocated equity—MISCOA" account was changed to "Fertilizer Allotment Reserve" 2) "Allocated Equity" account was changed to "Revolving Equity" account.

Valco informed Gulf Coast by letter dated August 26, 1975, that the Valco Board of Directors had authorized a distribution of margins for the Valco fiscal year ending May 31, 1975. The allocation was as follows:

\*   \*   \*   \*   \*   \*   \*

| | | |
|---|---|---|
| "Division rebate (margins) | $49,596.89 | |
| Mississippi Chemical rebate | 28,065.04 | |
| Total rebate | | $77,661.93 |
| Distribution: | | |
| Cash (30% of margins & Miss. Chem.) | $52,944.11 | |
| Reserve for contingencies | 7,439.53 | |
| Fertilizer Allotment Reserve Revolving Equity | 27,278.29 | |
| Total Distribution | | $77,661.93" |

\*   \*   \*   \*   \*   \*   \*

On July 27, 1976, Valco made another allocation to Gulf Coast of margins of $32,815.28, composed of $22,629.39 cash and $10,185.89 distribution to "Allocated Capital Equity MISCOA".

The parties stipulated that had Mr. R. Douglas Hall of Miscoa, director of field services, testified, he would have done so according to the contents of a letter prepared by him dated May 19, 1976, wherein he stated:

\*   \*   \*   \*   \*   \*

"I received a request today from one of your customers and stockholders asking for a record of the trading price of MCC Series II and Series IV stock on March 3, 1975, and April 1, 1975.

There were no transactions recorded on those specific dates; therefore, I am listing below the last transaction prior to the dates and the first transaction following the dates requested:

Series II

| Trading Date | Price Per Share |
| --- | --- |
| February 21, 1975 | $175 per share |
| March 5, 1975 | 175 per share |
| March 19, 1975 | 176 per share |
| April 3, 1975 | 175 per share |

Series IV

| Trading Date | Price Per Share |
| --- | --- |
| February 20, 1975 | $ 75–$77 per share |
| March 5, 1975 | 76–$76.50 per share |
| March 19, 1975 | 77–$81 per share |
| April 3, 1975 | 76–$78 per share" |

\* \* \* \* \* \* \* \* \* \* \* \*

▪ There is a dispute between the parties as to whether the letters exchanged between them formed a contract. To form such a contract the offer must be clear and definite just as there must be a clear and definite acceptance of all terms contained in the offer. A court, in deciding whether a contract was made, should determine from the facts that all essential terms thereof have been met. See *Patton v. Rucker*, 29 Tex. 402 (1867); *Ray v. Blue*, 173 S.W.2d 258 (Tex.Civ.App.—Eastland 1943, writ ref'd w. o. m.); 13 Tex.Jur.2d, Contracts § 27 (1960). The writings or instruments referred to in the letters which are claimed to constitute a contract will be construed as being part of the contract if it is determined by the court that a contract was made by such letters. *Board of Ins. Com'rs v. Great Southern Life Ins. Co.*, 150 Tex. 258, 239 S.W.2d 803 (1951); *Davis v. Volunteer State Life Ins. Co.*, 135 S.W.2d 588 (Tex.Civ.App.—Texarkana 1939, writ ref'd); *Page Airways, Inc. v. Associated Radio Serv. Co.*, 545 S.W.2d 184 (Tex.Civ.App.—San Antonio 1976, writ ref'd n. r. e.). The court, in ascertaining the true intention of the parties to a contract that is susceptible of more than one interpretation, must consider the subject matter of the contract and the surrounding circumstances existing when the contract was executed. *Lone Star Gas Co. v. X-ray Gas Co.*, 139 Tex. 546, 164 S.W.2d 504, 508 (1942); *Ward v. Christopherson*, 518 S.W.2d 273, 277 (Tex.Civ. App.—Waco 1975, writ ref'd n. r. e.).

The letters between Gulf Coast and Valco, above quoted, do not make it certain that Gulf Coast acquired "stock" in Miscoa, or that Gulf Coast acquired an equity in Valco. Neither party attempted to clear up the confusion which was created by the use of loose language in the letters and neither sought to have the other clarify what was meant by the language used in the particular letters.

Except for the execution of the contract, dated May 9, 1972, by and between Miscoa, Valco, and Gulf Coast, there is no evidence of any dealings directly between Miscoa, the "Company", and Gulf Coast, the "Agent". There is no evidence that Miscoa or Valco issued any certificates of stock of any nature to Gulf Coast. There is some evidence, as reflected by the several letters exchanged between Miscoa and Valco concerning Valco's checks for $288,000.00 and $117,000.00, respectively, which will support an inference that Valco was the holder of a certificate of Miscoa Series IV stock. However, there is no evidence that a certificate was ever issued to Valco for Series II stock, although there is evidence which will support an inference that Valco, by the payment of $288,000.00 to Miscoa, expected that such a certificate would be issued. Also, there is considerable dispute in the record concerning whether or not the parties, by the investment by Gulf Coast of margins ($5,491.03) and the cash ($91,-460.92) with Valco, intended the investment to be a purchase of Series II and Series IV classes of Stock in Miscoa, or whether it was simply a purchase of equity in Valco for whatever that would mean or be.

Valco's November 30 letter, clearly contemplated that upon Gulf Coast's exercise

of the option "to take your fertilizer allocation", it would be issued *a letter of equity* in Valco. The December 13 letter from Valco indicated that the option was *to purchase equity* in Miscoa. Gulf Coast's December 14 letter, which enclosed the $91,460.92 check, stated that the check was for the purchase of *Miscoa* Series II and Series IV stock. The letter from Valco, dated December 27, acknowledged receipt of the check for the *purchase of stock* in Valco. The problem presented, i. e., did the letters constitute a contract whereby there was an agreement for Gulf Coast to acquire both Series II and Series IV Miscoa stock, or whether the agreement simply permitted Gulf Coast to acquire an equity in Valco, was never clearly resolved.

Mr. W. S. Pawlik and Mr. D. Stockton, officers of Gulf Coast, maintained that they understood from dealings with Tanamachi and others at Valco that Gulf Coast was getting Miscoa stock from Valco which had been issued to Valco by Miscoa. Pawlik stated that prior to delivery of the check to Valco, Tanamachi had told him that Gulf Coast would be buying Miscoa stock. Tanamachi disputed Pawlik's testimony and further testified that at field meetings, at which Pawlik and Stockton were present, it was made clear that the sole purpose of the Gulf Coast's investment was to secure an allocation of fertilizer, and it was understood that the investment would constitute an equity in Valco. Skinner, a field man for Valco in late 1973, testified that the investment was to secure an allocation of fertilizer, which would be distributed to farmers (patrons of Gulf Coast) through Gulf Coast, and that when Gulf Coast ceased to buy from Valco, the investment would be returned to Gulf Coast. Skinner also testified that while the investment in Valco was often the subject of conversation, at no time was it suggested that Miscoa stock was being issued to non-member patrons, such as Gulf Coast. Testimony of Daniel Macomb, another field man for Valco, essentially supported that of Skinner and Tanamachi.

Inquiries were made of the jury as to whether Gulf Coast acquired $5,491.03 worth of Miscoa stock by virtue of the 1972 and 1973 distributions (Special Issue 1); whether Valco sold Gulf Coast $91,460.92 worth of Miscoa stock (Special Issue 3); and whether all of such stock was converted by Valco on March 3, 1975 (Special Issues 2 and 4). The issues were general in nature and did not differentiate between Series II and Series IV stock. The jury, in answering Special Issues 1 and 3, were required to find that Gulf Coast either acquired ownership of both Series II and Series IV or that Gulf Coast did not acquire ownership of any stock in either Series II or Series IV. Concerning Special Issues 2 and 4 (the inquiries on conversion), the jury was required to find that Valco converted both Series or that it did not convert either of the Series. All of the monies evidenced by both the distribution of "margins" and the "check" were required in order to obtain allocations for both Mixed Grade Fertilizer (Series IV) and Nitrogen Fertilizer (Series II).

The evidence relating to whether or not Gulf Coast, by the "margins" of $5,491.03 and the "check" for $91,460.92, acquired ownership of Series II and Series IV Miscoa stock is so interrelated and interwoven as to be impossible to separate the evidence which pertains solely to Series IV. The same evidence relating to the claimed purchase and conversion of Series II applies with equal force with respect to Series IV. There is no evidence which deals exclusively with one series to the exclusion of the other. The only difference as to what was actually acquired by Gulf Coast in making the investment is that in setting forth the allocation for each of the Series, the Mixed Grade fertilizer, representing Series IV stock allocation was expressed in dollars, while the Nitrogen fertilizer, representing Series II stock allocation, was expressed in tons.

The judgment permitted a recovery for conversion of Series IV stock (Mixed Grade fertilizer) and denied a recovery for conversion of Series II stock (Nitrogen fertilizer). The trial court, in rendering judgment, concluded that Gulf Coast was entitled to judgment on the verdict with respect to Series IV stock, but that as a matter of law it did not acquire ownership of any Series II

stock. Apparently, this determination was due to the interpretation placed on the contents of the letters exchanged between Valco and Miscoa during the period May 25, 1973 to December 11, 1973, above noted. As stated, those letters authorize an inference that Valco did actually receive a certificate for Miscoa Series IV stock, but do not support such an inference as to Series II stock.

Under the evidence and all permissible inferences, if Gulf Coast acquired ownership of Series II stock, then it also acquired ownership of Series IV stock, and vice versa. The same holds true with reference to the issue of conversion. The money damages for the conversion of Series II Nitrogen stock, if converted, were just as susceptible to calculation as were the money damages for the conversion of Series IV stock, if converted. While the Series II allocation was made in tons, it was purchased with dollars and was sometimes referred to as a purchase of "equity" or "stocks" in Miscoa, and sometimes referred to as "equity" in Valco. Both allocations in Mixed Grade fertilizer and Nitrogen fertilizer were secured by investment of two lump sums of dollars. In short, under the facts and circumstances of this case, we find no basis for distinguishing between Series IV and Series II stock, such that ownership by Gulf Coast in Series IV may be decreed but not ownership in Series II, and that recovery may be allowed for conversion of Series IV, but not of Series II.

■ We agree with Gulf Coast that the trial court erred in rendering judgment non obstante veredicto with respect to Series II stock, because there was some evidence that Gulf Coast owned shares in Series II stock, and that such stock was converted by Valco. We further agree with Gulf Coast that the judgment, in effect, amounted to "an erroneous bifurcation" of the jury findings. Gulf Coast's points 1 and 2 are sustained.

■ We do not agree that ownership of Series II Miscoa stock by Gulf Coast was established as a matter of law by the uncontroverted evidence; nor do we agree that such ownership of Series II Miscoa stock was conclusively determined. Issues of fact are presented. We do not agree that the value of Series II Miscoa stock on March 3, 1975 was established as a matter of law by the uncontroverted evidence. Assuming, arguendo, that Gulf Coast did own shares in Miscoa Series II "stock", and that Valco did convert the "stock", there is an issue of fact with respect to whether it was converted on March 3, 1975, and also an issue of fact as to the value of Series II stock on that date. While it was stipulated that a Miscoa representative, if called as a witness, would testify that the "trading price" of Series II stock at the time in question was $175.00 per share, the evidence also shows that Valco was able to purchase Series II stock sometime in March, 1975 at only $100.00 per share. It is not conclusively shown that Valco was able to purchase the Series II stock on the basis of its preferential status. The issue was not submitted to the jury. The trial court did not make a finding on the issue of damages relating to Series II stock since it denied recovery for that particular series of stock. Gulf Coast's point 3 is overruled.

■ We now consider Valco's complaints. After reviewing the evidence in its entirety, and applying the well settled rules concerning "no evidence" and "factually insufficient evidence points" to the record here presented, we hold that there is some evidence that Valco agreed to sell and distribute stock in Miscoa to Gulf Coast and that Valco converted the stock on March 3, 1975. However, we further hold that the evidence is factually insufficient to show any agreement whereby Valco agreed to sell Gulf Coast any stock in Miscoa, either Series II or Series IV, or both, or that such stock (Series II and IV) was converted by Valco on March 3, 1975. Valco's no evidence points directed at the jury's answers to Special Issues 1, 2, 3 and 4 are overruled; but its factually insufficient evidence points with respect to those Issues are sustained.

We now consider whether or not there was a breach of contract as a result of Valco's refusal to sell certain quantities of fertilizer to Gulf Coast subsequent to March 3, 1975. Gulf Coast contends that its unused portion of the fertilizer allocation for

Miscoa fiscal year (July 1, 1974 to June 30, 1975), on March 3, 1975, consisted of 393.915 tons of Nitrogen fertilizer, 90 tons of Mixed Bag Dry fertilizer and 843.315 tons of Bulk Mixed Dry fertilizer. Valco disputes that claim. It asserts that the jury's finding (Special Issue 5) that it (Valco) "acted wrongfully on March 3, 1975" when it refused to sell Gulf Coast the remaining balance of fertilizer theretofore allocated to it for the fiscal year 1974–1975, was not supported by legally or factually sufficient evidence.

Valco claims that exemptive tax-status was impliedly required of Gulf Coast, and that it was entitled to terminate the contract whenever it discovered that Gulf Coast had breached that implied condition. In its dealings with all cooperatives, Valco relied on assurances from each that the particular cooperative was indeed tax-exempt. On October 4, 1972, the Internal Revenue Service (IRS) notified Gulf Coast in writing that since it failed to treat members and non-members alike pertaining to patronage dividends, it could not be treated as a tax-exempt cooperative. Although repeated demands were made by Valco that Gulf Coast furnish it with a tax-exempt letter from the IRS, that was not done until July, 1974, as hereinafter detailed. However from early May, 1972, until the date such IRS letter was furnished, Valco did business with Gulf Coast, as Tanamachi explained, because of the assurance by Gulf Coast that it was, in fact, tax-exempt.

In July, 1974, Valco wrote Gulf Coast and insisted on a tax-exempt letter "to justify" continued business with Gulf Coast. Valco was then withholding Gulf Coast's allocation until it met the requirements imposed on all other cooperatives, which, apparently, was merely a tax-exempt letter from the IRS. Such a letter from the IRS, dated July 24, 1974, but effective June 18, 1974, was finally received by Gulf Coast and a copy thereof was delivered to Valco. Evidently, Valco was not satisfied that Gulf Coast was entitled to tax-exempt status. Several meetings were held between representatives of the two cooperatives whereby Valco questioned the tax-exempt status of Gulf Coast. At some time between the date Valco received a copy of Gulf Coast's tax-exempt letter and October 26, 1974, Valco conducted its own audit of Gulf Coast's business, activities and operations, and as a result of its personal audit, it unilaterally determined that Gulf Coast was not operating as a tax-exempt cooperative. There is no evidence that any other cooperative was audited as such by Valco; or that Valco required anything of the other cooperatives with which it was doing business other than a tax-exempt letter from IRS.

Valco asserts that there is no evidence that it agreed to continue selling fertilizer to Gulf Coast through June 30, 1975; and, that the most that is exhibited by the record is a terminable open offer whereby each purchase by Gulf Coast was a separate transaction representing an acceptance by Gulf Coast of Valco's offer to sell the particular fertilizer involved in that separate transaction. We do not agree. The business arrangement between Valco and Gulf Coast including price and terms of allocation, accounting, and the like, were tied into Miscoa's fiscal year (July 1 to June 30). Prior to March 3, 1975, there was no mention of separate purchases; on the contrary, the transaction as a whole was envisioned on a yearly basis. The Valco Board of Directors, in October, 1973, determined that nitrogen fertilizer sales should be allocated to patrons on the basis of "last year's purchases" and that its customers (like Gulf Coast) would receive allocation on the same basis "for the period of Miscoa's next fiscal year".

Allocations were made on a yearly basis, as were the follow-up distribution letters. In the December 13, 1973 letter to Gulf Coast, Tanamachi stated that Gulf Coast, by making the required investment, was not only assuring itself of the amount of fertilizer for 1972–73 Miscoa fiscal year, but "for every year" in the future that Gulf Coast retained the equity. Valco admitted that Gulf Coast owned the equity until March 3, 1975. Again, in a letter dated July 25, 1974, Tanamachi stated that Gulf Coast's "allocation" would be "released" only when a cer-

tain requirement was met. That requirement, a tax-exempt letter, was met.

■ The fact that the delivery and payment for fertilizers may have taken place on a per delivery basis is not controlling since it appears that the parties understood the relationship to be on a yearly basis. It also appears from the record that the parties, in making a yearly allocation of fertilizers, were following general custom of the fertilizer business. See 13 Tex.Jur.2d, Contracts, § 129 p. 303 (1960). Valco's unilateral repudiation of the contract was without contractual or conditional basis and therefore constituted a breach of the agreement between the parties. *Pollack v. Pollack,* 39 S.W.2d 853, 855 (Tex.Comm'n App.1931, holding adopted); *Abrams v. Brent,* 362 S.W.2d 155, 159 (Tex.Civ.App.—Austin 1962, writ ref'd n. r. e.). We hold that Gulf Coast and Valco, as evidenced by the aforesaid letters exchanged between them, entered into a valid contract whereby Gulf Coast, upon making the required payment in money to Valco, acquired an absolute right to purchase a set amount of Miscoa fertilizer from Valco, which right could not be terminated in the manner attempted by Valco. We also hold there is ample evidence of probative value to support the jury finding that Valco wrongfully refused to sell Gulf Coast the unused portion of fertilizers for the period in question. Valco's points 5 and 6 are overruled.

■ Valco further asserts that the trial court's award of damages for breach of contract in addition to the award in connection with the Series IV Dry Mixed fertilizer stock amounts to a double recovery of damages. This point is without merit. Gulf Coast has sought recovery for a required investment, part of which it claims was used for the purchase of Series IV Miscoa stock. In addition, it sought recovery, as a separate cause of action, for breach of contract for failure to deliver the allocation of fertilizer for the year 1974–75. We find no indication of an agreement that the required investment was to be used as liquidated damages, nor do we find an agreement that the unused portion of a yearly

fertilizer allocation was to be equated with the required investment. Recovery for both would not amount to a double recovery. *Young v. Hicks,* 559 S.W.2d 343, 344 (Tex.Sup.1977); *Great American Reserve Insurance Company v. Britton,* 406 S.W.2d 901, 907 (Tex.Sup.1966). Valco's point 8 is overruled.

Valco's point 7 pertaining to the error of the trial court in allowing interest on $138,-266.91 at the rate of 9% per annum from September 1, 1975, until date of judgment is sustained.

In view of our disposition of this appeal, it is not necessary for us to consider Valco's remaining points.

The action for damages because of Valco's breach of contract is severed from the action for damages because of the alleged conversion of Miscoa stock. That portion of the judgment which decreed that Gulf Coast recover from Valco the sums of $18,-907.92, $3,060.00 and $32,889.28, totalling $54,857.20, as damages for Valco's refusal to sell to Gulf Coast the unused portion of the fertilizer allocated to it for the period July 1, 1974 to July 30, 1975 (Miscoa's fiscal year), together with interest thereon at the rate of 9% per annum from April 12, 1977 (the date judgment was signed) until paid, is affirmed.

That portion of the judgment whereby it was decreed that Gulf Coast recover $138,-266.91 of and from Valco for conversion of the Series IV Mixed Fertilizer stock of Miscoa, is reversed, and that portion of the judgment which sustained Valco's motion for judgment non obstante veredicto insofar as it relates to conversion of Series II Nitrogen stock is also reversed; and, both actions for alleged conversion of stock are remanded to the trial court for a new trial.

Costs of this appeal are assessed 50% to Gulf Coast and 50% to Valco.

AFFIRMED IN PART and REVERSED and REMANDED IN PART.