**UNITED STATES COURT OF APPEALS**
**FIFTH CIRCUIT**

_____

No. 96-50837
_____


HIDDEN OAKS LIMITED, ET AL

                        Plaintiffs

HIDDEN OAKS LIMITED

                        Plaintiff - Appellee-Cross-Appellant,

versus


THE CITY OF AUSTIN,


                        Defendant - Appellant-Cross-Appellee.


Appeals from the United States District Court
        for the Western District of Texas

April 29, 1998

Before JOHN R. GIBSON[*], JOLLY, and EMILIO M. GARZA, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

    Hidden Oaks Limited ("Hidden Oaks") and the City of Austin (the "City") cross-appeal the district court's entry of judgment for Hidden Oaks on claims of breach of contract and procedural due process, its dismissal of Hidden Oaks' substantive due process and takings claims, and its award of $115,000 in attorney's fees to Hidden Oaks.  We affirm in part, reverse and vacate in part, and remand.

_____

    [*]Circuit Judge of the Eighth Circuit, sitting by designation.

I

Hidden Oaks owns Stoneridge Apartments ("Stoneridge"), an eight-building, 137-unit complex located in Austin, Texas. In August 1994, the City served on Hidden Oaks eight written Notices of Violation (one for each of the complex's buildings) asserting that Stoneridge failed to comply with certain provisions of the City Uniform Housing Code ("housing code" or "code"). Specifically, the City alleged that some of the windows in Stoneridge were not large enough to serve as exit routes in case of a fire and also that certain exterior structures such as balconies and walkways were rotting and in need of repair. The notices advised that if Hidden Oaks "disagree[d] with these findings, [it] ha[d] appeal rights as set forth in the Housing Code," which stated that "[a]ny person affected by any notice of substandard violations may request and shall be granted an appeal and hearing before the Building and Standards Commission."

The notices also threatened that as long as Stoneridge remained in violation of the code, the City "reserve[d] the right to place a hold on all utilities," meaning that once the current tenant moved out of a unit, the new tenant could not reconnect utility service. The notices did not specify the circumstances under which the City would exercise its right to impose a utility hold on a property, but the City's deputy building official, Stuart Hersch, testified at trial that his inspectors generally made these determinations based on factors such as the owner's overall cooperativeness and willingness to make repairs.

The parties produced conflicting evidence at trial as to whether the City provided any way to appeal a building inspector's imposition of a hold, separate and apart from the appeal procedure provided to challenge an inspector's citation of a property as substandard. The City argued that even an owner who admitted the presence of code violations could appeal to the Building and Standards Commission (the "Commission"), seeking a reprieve or variance from the imposition of a hold——just as the building inspector in the first instance might find code violations and yet refrain from placing the hold at all. Hidden Oaks, on the other hand, claimed that the City entrusted its building inspectors with final, unreviewable authority over which substandard buildings would suffer holds and which would not.

In any event, the parties did not dispute that the Commission routinely heard appeals related to the correctness of the building inspector's citations, *i.e.*, the Notices of Violation. Indeed, shortly after receiving the notices at issue here, Hidden Oaks filed an appeal with the Commission, asserting that "our 30-year-old apartment complex meets the requirements" for egress windows and "retrofitting of buildings would not achieve a significant life/safety improvement and would place an undue financial hardship on [the] owner." Hidden Oaks did not appeal the citations of the building inspector regarding the condition of the balconies and walkways, nor did Hidden Oaks petition the Commission for a reprieve from the threatened holds.

Prior to the hearing on Hidden Oaks' appeal, Hersch, along

with another employee of the City, Terri Hasbrook, set up a meeting with Chip McLelland, an employee of Hidden Oaks, to discuss Hidden Oaks' pending appeal. During the meeting, McLelland expressed his desire to cooperate fully with the City and avoid the imposition of utility holds. The City, for its part, suggested that it might provide some fire-safety-related alternatives for Stoneridge, rather than insisting that Hidden Oaks essentially tear down the complex to expand the size of every window.

At the end of the meeting, McLelland asked Hersch to "put [their agreement] in writing." Hersch suggested instead that McLelland draft a letter, which Hersch then would approve. McLelland sent the letter several days later, stating that Hidden Oaks was "requesting a postponement of [their] appeals to the Board," and setting forth a proposal by which Hidden Oaks would install "hard wired smoke detector[s] with battery back-up[s] in each unit which has deficient egress" and "electronically interconnect smoke detectors in each sleeping room [of the] multi-bedroom units." In closing, McLelland noted: "I believe this [proposal] addresses the major safety concerns expressed by your Code Enforcement inspector and along with the now completed electrical repairs, removed sign wiring, and the progress being made on A/C platform repair, will avoid any further necessity of threatened utility holds." Hersch wrote "approved" in one corner, along with his signature, and placed the letter in Hidden Oaks' file.

Shortly after sending the letter ("September 1994 letter

agreement"), Hidden Oaks learned that the City in fact had placed a utility hold on Stoneridge, contrary to Hidden Oaks' understanding of the meeting with Hersch and the subsequent September 1994 letter agreement. Following this discovery, Hidden Oaks continued to negotiate with the City for the removal of the hold, but the City did not release the last unit in Stoneridge until February 1996.[1]

Hidden Oaks filed this suit in December 1995, alleging breach of contract, violation of the Fifth Amendment takings clause, and violation of various sections of the Texas Local Government Code. The district court dismissed the Fifth Amendment takings claim as unripe, and Hidden Oaks subsequently amended its complaint to include an inverse condemnation claim under Article I, § 17 of the Texas Constitution as well as several federal claims for violations of substantive and procedural due process. The case proceeded to trial in late September 1996. At the close of Hidden Oaks' presentation of evidence, the district court dismissed the substantive due process and inverse condemnation claims, finding that the City's actions were "rationally related to . . . protect[ing] [the] health and safety of citizens" and that "under the law, [the City] can't be unreasonable when they are enforcing safety and health codes."

The jury responded to interrogatories on the breach of contract and procedural due process claims, finding for Hidden Oaks

---

[1] Although the City placed the original hold on the entire complex, releases occurred first on a building-by-building and then eventually on a unit-by-unit basis.

in both instances.  The jury awarded damages of $231,089 and attorney's fees of $115,000 for the breach of contract claim, and nominal damages of $1 for the procedural due process violation. The district court entered judgment for a total sum of $346,090 plus interest and costs, and denied both parties' requests for attorney's fees pursuant to 42 U.S.C. § 1988.  Both the City and Hidden Oaks filed timely appeals.

II

Before trial, the district court dismissed Hidden Oaks' federal takings claim for lack of jurisdiction, relying on the two-prong ripeness test of *Williamson County Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 186, 195, 105 S. Ct. 3108, 3116, 3121, 87 L. Ed. 2d 126 (1985) (holding that claims for compensation under the Fifth Amendment takings clause are not ripe until (1) the relevant governmental unit has reached a final decision as to what will be done with the property and (2) the plaintiff has sought compensation for the alleged taking through whatever adequate procedures the state provides).  We review jurisdictional determinations *de novo* and are free to consider all issues relevant to that inquiry, even those not addressed by the district court. *See Samaad v. City of Dallas*, 940 F.2d 925, 934 (5th Cir. 1991) (noting that the ripeness analysis of *Williamson County* "is a jurisdictional requirement that cannot be waived").

Here, the district court held that Hidden Oaks failed to satisfy the first prong of *Williamson*—requiring that the City "arrive[] at a final, definitive position regarding how it will

apply the regulations at issue to the particular land in question"——because Hidden Oaks failed to petition the Commission for a reprieve or "variance" from the building inspector's decision to impose a utility hold on Stoneridge. *Williamson*, 473 U.S. at 188, 105 S. Ct. at 3117 (holding federal takings claim unripe because respondent did not seek variances that would have allowed it to develop the property, notwithstanding the commission's finding that the plan as submitted did not comply with the relevant regulations). Hidden Oaks disputes that the Commission would even entertain such a variance petition, and urges that we reverse the district court's dismissal as based on the clearly erroneous factual conclusion that such variance procedures were in fact available.

We need not resolve this factual dispute,[2] particularly in light of Hidden Oaks' failure to follow through with any formal process of appeal. Both parties agree that regardless of whether the Commission would hear a request for a reprieve or variance from

---

[2] In its order of April 8, 1996, dismissing Hidden Oaks' federal takings claim for lack of jurisdiction, the district court resolved this factual dispute by explicitly crediting the affidavit of Stuart Hersch, the City's deputy building official, for the proposition that "utility holds may be appealed to the Building and Standards Commission." Subsequent events at trial, however, raised serious questions regarding Hersch's credibility. At the close of Hidden Oaks' presentation of evidence, the district court expressed concern over the fact that "[w]e have disputed evidence as to whether or not there is in effect any appeal with regard to the utility hold." At that point, even the City agreed that the factual question of whether the City provided an appeal on that issue was disputed and in need of resolution by the jury. For various reasons not relevant here, this issue never reached the jury, ostensibly leaving the district court's April 1996 order of dismissal as the final factual determination regarding what methods of appeal the City provided.

a utility hold, the Commission certainly would hear claims that a hold had been wrongfully imposed, *i.e.*, that the building in question was not substandard. To the extent that Hidden Oaks disputes the City's characterization of Stoneridge as substandard or dangerous, this route of appeal offers a relevant form of review that Hidden Oaks admittedly abandoned, mandating that we dismiss for lack of jurisdiction under *Williamson*.[3] To the extent that Hidden Oaks claims to have admitted the presence of certain dangerous conditions, making this route of appeal irrelevant, it has no cause of action under the Fifth Amendment. *See United States v. Locke*, 471 U.S. 84, 107, 105 S. Ct. 1785, 1799, 85 L. Ed. 2d 64 (1985) ("Regulation of property rights does not 'take' private property when an individual's reasonable, investment-backed expectations can continue to be realized as long as he complies with reasonable regulatory restrictions the legislature has imposed."); *Texaco, Inc. v. Short*, 454 U.S. 516, 530, 102 S. Ct. 781, 792, 70 L. Ed. 2d 738 (1982) ("[T]his Court has never required

---

[3] In its brief to this court, Hidden Oaks attempts to evade the issue of ripeness by recharacterizing its allegations as fitting within the "temporary takings" analysis of *First Evangelical Lutheran Church v. County of Los Angeles*, 482 U.S. 304, 107 S. Ct. 2378, 96 L. Ed. 2d 250 (1987). Hidden Oaks points out that the City lifted the last holds on Stoneridge in February 1996, several months after Hidden Oaks filed its complaint, and we therefore now know exactly what has been done with the property. This argument ignores the well-settled rule that jurisdiction "is determined at the outset of the suit," based on the allegations of the plaintiff's complaint. *Mobil Oil Corp. v. Kelley*, 493 F.2d 784, 786 (5th Cir. 1974). *See also Williamson*, 473 U.S. at 183 n.7, 194, 105 S. Ct. at 3115 n.7, 3120 (finding respondent's claim unripe despite recognizing that during the pendency of the appeal, the parties reached an agreement as to how Williamson County would permit the Bank to develop its property).

the State to compensate the owner for the consequences of his own neglect."). Consequently, we hold that the district court did not err in dismissing Hidden Oaks' federal takings claim.

III

At the close of Hidden Oaks' presentation of evidence, the district court granted the City's motion for judgment as a matter of law with respect to Hidden Oaks' claim for inverse condemnation under Article I, § 17 of the Texas Constitution. Finding as a matter of law that Hidden Oaks could demonstrate neither "actual physical appropriation" of its property, nor "unreasonable interference" with its use, the district court noted that "the City can't be unreasonable when they are enforcing safety and health codes." *See generally Town of Sunnyvale v. Mayhew*, 905 S.W.2d 234, 259 (Tex. 1995) (holding that a "taking" for purposes of a claim for inverse condemnation under Article I, § 17 can be "either a physical appropriation of the property or an unreasonable [*i.e.,* arbitrary] interference with the landowner's right to use and enjoy his property").

We review the district court's grant of a motion for judgment as a matter of law *de novo*. *See Murray v. Red Kap Indus., Inc.*, 124 F.3d 695, 697 (5th Cir. 1997). To the extent that our review requires consideration of the evidence introduced by the parties, as opposed to pure questions of law, we apply "the same standard as the district court," considering "[a]ll evidence with all reasonable inferences in the light most favorable to the non-moving party." *Gutierrez v. Excel Corp.*, 106 F.3d 683, 686 (5th Cir.

1997). We affirm "if the facts and inferences point so strongly and overwhelmingly in favor of one party that no reasonable juror could arrive at a verdict contrary to the district court's conclusion." *Id.* We reverse if we find "substantial evidence" upon which "reasonable jurors might reach different conclusions." *Id.*

In urging reversal of the district court's judgment, Hidden Oaks relies primarily on the federal takings analysis conducted by the Supreme Court in *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1028, 112 S. Ct. 2886, 2900, 120 L. Ed. 2d 798 (1992) (finding a compensable taking even assuming *arguendo* that the state acted to protect the public health and safety). In this state-law context, we find *Lucas* to be of doubtful relevance. *See*, *e.g.*, *Palacios Seafood, Inc. v. Piling, Inc.*, 888 F.2d 1509, 1513 (5th Cir. 1989) (noting differences between Article I, § 17 of the Texas constitution and the federal Fifth Amendment). Moreover, even to the extent that Hidden Oaks relies on more relevant state-law standards, we find no evidence in the record to support any legally colorable argument for an inverse condemnation.

At various stages of the proceedings below, Hidden Oaks argued alternatively that the district court should find an inverse condemnation because (1) as a matter of law, utility holds are not related to health and safety; (2) as a matter of law, utility holds should be placed only for reasons related to the safety of providing utilities; and (3) factually, the City placed and/or kept holds on units in Stoneridge that were admittedly up to code.

The first and second of these arguments merit little

-10-

discussion. As a matter of law, placing utility holds on substandard property qualifies as a reasonable, non-arbitrary decision designed to accomplish the "legitimate goal" of keeping substandard housing unoccupied. *See Nash v. City of Lubbock*, 888 S.W.2d 557, 562-63 (Tex. App. 1994, no writ) (finding no compensable violation of due process in city's demolition of substandard buildings); *City of Lubbock v. Corbin,* 942 S.W.2d 14, 22 (Tex. App. 1996, writ denied) (finding that "it was not unreasonable" to refer even a newly constructed home to the Housing Standards Commission for possible demolition); *cf. Camara v. Municipal Court of San Francisco*, 387 U.S. 523, 535, 537, 87 S. Ct. 1727, 1734, 1735, 18 L. Ed. 2d 930 (1967) (upholding "the police power of municipalities to impose and enforce . . . minimum standards even upon existing structures" and noting that "the public interest demands that all dangerous conditions be prevented or abated").

Hidden Oaks argues in response that utility holds cannot be "reasonably related" to health and safety because they do not immediately protect the current tenant from the allegedly substandard conditions, and because a landlord may avoid the impact altogether by placing utilities in its own name. Yet simply demonstrating that a particular regulation is imperfectly adapted to its end, or contains loopholes through which one might avoid the desired impact, does not mean that the mechanism is unreasonable, or, more to the point, arbitrary. *See Hunt v. City of San Antonio*, 462 S.W.2d 536, 539 (Tex. 1971) ("If reasonable minds may differ as

-11-

to whether or not a particular . . . ordinance has a substantial relationship to the public health, safety, morals, or general welfare . . . the ordinance must stand as a valid exercise of the city's police power."); *Webb v. Dameron*, 219 S.W.2d 581, 584 (Tex. Civ. App. 1949, writ ref'd n.r.e.) ("Action is not arbitrary or capricious when exercised honestly and upon due consideration, where there is room for two opinions, however much it may be believed that an erroneous conclusion was reached.") (quoting *In re Persons Employed at St. Paul & Tacoma Lumber Co.*, 110 P.2d 877, 883 (Wash. 1941)); *cf. United States R.R. Retirement Bd. v. Fritz*, 449 U.S. 166, 175, 101 S. Ct. 453, 460, 66 L. Ed. 2d 368 (1980) (holding that classifications challenged under the Equal Protection Clause may be non-arbitrary even though imperfect).  Similarly, Hidden Oaks' protestations regarding the "arbitrary" nature of placing utility holds for reasons unrelated to the safety of providing utilities ignores the City's substantial and legitimate interest in keeping substandard housing unoccupied, not simply in ensuring the safe provision of electrical service.  *See Sims v. Century Kiest Apartments*, 567 S.W.2d 526, 531 (Tex. Civ. App. 1978, no writ) (recognizing as valid a city's interest in establishing ordinances that ensure that "dwellings offered for rental be safe and fit for habitation").

Hidden Oaks' remaining allegation))that the City placed utility holds on non-substandard units in an effort to force Hidden Oaks to bring other units in Stoneridge up to code))presents a more troubling scenario, and a closer question of "unreasonableness"

under state law.  *See City of Pharr v. Pena*, 853 S.W.2d 56, 61 (Tex. App. 1993, writ denied) (recognizing that courts may find a taking when the government has acted with an "improper motive"); *Southwestern Gas & Elec. Co. v. Stanley*, 70 S.W.2d 413, 415 (Tex. 1934) (authorizing punitive damages against utility for cutting off service to a residence in order to force the owner to pay a separately metered and contested bill for service to his business). Nevertheless, in order to prevail on such a theory, Hidden Oaks would need to demonstrate, at an absolute minimum, that at least one non-substandard unit in Stoneridge suffered a utility hold at some particular, definite moment in time.

The record reveals, however, that Hidden Oaks presented no clear evidence at trial as to when particular units suffered the imposition of utility holds, much less if those particular units, at that particular time, met all applicable sections of the housing code.  On cross-examination, Hidden Oaks' witness Brian Cunningham admitted that he had records indicating when the City placed and released holds on various units.  Inexplicably, however, Hidden Oaks failed to introduce that evidence and therefore failed to demonstrate that any unit in Stoneridge suffered a utility hold at the same time that it satisfied all sections of the City housing code.[4]

---

[4] Hidden Oaks did attempt to demonstrate this point by eliciting testimony that (1) a substantial number of the units in Stoneridge were efficiencies, (2) the alleged code violations relating to window size would not apply to efficiencies, and (3) the entire complex of Stoneridge suffered a utility hold for some period of time.  As the district court noted, however, this argument ignores the other  code violations alleged by the City,

As a result of this failure of proof, we see no substantial evidence that would enable a reasonable juror to determine that Hidden Oaks suffered an inverse condemnation of its property. We therefore hold that the district court did not err in granting judgment as a matter of law with respect to this claim.

IV

Following Hidden Oaks' presentation of evidence, the City also moved for judgment as a matter of law on Hidden Oaks' claim for damages, under 42 U.S.C. § 1983, based on a denial of substantive due process. The district court granted the motion, finding as a matter of law that the City's actions were "rationally related to protecting the health and safety of citizens." *See FM Properties Operating Co. v. City of Austin*, 93 F.3d 167, 174 (5th Cir. 1996) ("[G]overnment action comports with substantive due process if the action is rationally related to a legitimate government interest."). Whether this "rational relation" in fact exists is a question of law that we review *de novo*. *See id.* at 172 n.6.

In arguing that the district court erred in finding a rational relation between the City's placement of utility holds and the protection of health and safety, Hidden Oaks does not appear to appreciate the limited range of a substantive due process analysis. *See*, *e.g.*, *Shelton v. City of College Station*, 780 F.2d 475, 477 (5th Cir. 1986) (holding that decisions of state zoning boards do not violate substantive due process unless the court finds no "conceivable rational basis" on which the board might have based

which were not necessarily inapplicable to efficiencies.

-14-

its decision).  Thus, Hidden Oaks maintains strenuously on appeal that the City behaves rationally in placing a utility hold on a property only when allowing utility service to continue would itself create a risk to public health or safety——as when faulty wiring creates a risk of fire, or leaking pipes create a risk of flood.  Accordingly, Hidden Oaks argues that in placing a utility hold on Stoneridge simply to force the repair of other types of dangerous violations——such as rotting balconies or inadequate fire escape routes——the City has stepped beyond the bounds of rationality and violated Hidden Oaks' right to substantive due process.

In support of this proposition, Hidden Oaks cites *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S. Ct. 154, 90 L.Ed. 95 (1945), again a case we find to be of doubtful relevance.  In any event, we need not belabor our earlier conclusion that municipalities do in fact have a substantial, legitimate interest in keeping substandard housing unoccupied, and are entitled to further this interest by ensuring that landlords either repair their property during the current tenancy or face a complete loss of income from the substandard unit.  *See Camara*, 387 U.S. at 537, 87 S. Ct. 1735 ("[T]he public interest demands that all dangerous [housing] conditions be prevented or abated."); *United States R.R. Retirement Bd*, 449 U.S. at 179, 101 S. Ct. at 461 (refusing to hold government action "arbitrary" when "plausible reasons" exist for that action).

Given the limited nature of our review, we agree with the

-15-

district court that the City's actions were "rationally related to the protection of [the] health and safety of citizens" and therefore not actionable as violations of the Fourteenth Amendment. Accordingly, we hold that the district court did not err in granting judgment as a matter of law on this claim.[5]

V

At the close of all the evidence, the jury found for Hidden Oaks on both the procedural due process and breach of contract claims. In framing these issues for the jury, Hidden Oaks argued that the September 1994 letter agreement formed an enforceable contract, in which Hidden Oaks agreed to withdraw its appeal of the window-size violations as consideration for the City's promise not to place a utility hold on Stoneridge. Hidden Oaks also alleged that the City violated Hidden Oaks' due process rights by performing a sort of "bait and switch" with the appeal of the underlying violations—convincing Hidden Oaks to withdraw its appeal in exchange for a promise that no holds would be imposed, and then breaching that agreement after the deadline for appeal had passed.

The City asserted at the charge conference that these theories of recovery were inconsistent. Either the City took away Hidden Oaks' right to appeal, or Hidden Oaks surrendered it voluntarily as

---

[5] To the extent that Hidden Oaks may have stated a more plausible claim for a violation of its right to substantive due process by demonstrating that the City placed holds on non-substandard units, we note again that we will not address the legal merits of this claim in light of Hidden Oaks' failure to prove the necessary, underlying facts. *See supra* at 13.

consideration for certain benefits from the City. The district court admitted the possibility of a conflict, but decided to wait for the jury's verdict before ruling on the City's objection. Once the jury returned, however, having found for Hidden Oaks on both claims, the district court denied the City's motion for a new trial and renewed motion for judgment. The City appeals the denial of these motions on the grounds that (1) Hidden Oaks failed to prove a protected property interest either in continued utility service or in renting the units at Stoneridge, (2) no valid contract existed because the City Council never ratified the September 1994 letter agreement, (3) the contract as found by the jury would be unenforceable, and (4) neither the text of nor the circumstances surrounding the September 1994 letter agreement demonstrated mutual assent to remove utility holds from Stoneridge.[6]

---

[6] The City also alleges two additional points of error, which we find unworthy of textual discussion. The first involves the City's allegation, raised for the first time in its reply brief, that insufficient evidence supports the jury's finding of a procedural due process violation. Not only is this point of error untimely, *see United States v. Green*, 46 F.3d 461, 465 n.3 (5th Cir. 1995) (holding issue raised for the first time in a reply brief waived), but additionally, in making the argument, the City appears to fundamentally misunderstand the jury's verdict. Devoting itself to refuting "[p]laintiff's argument of no valid appeal for utilty holds," this section of the City's reply brief continues to argue the issue of whether or not the Building and Standards Commission would have entertained a petition for a repreive or variance from a legally imposed utility hold. As noted above, however, this factual dispute was not the basis for the jury's finding of a procedural due process violation; rather, the basis for the verdict was the City's allegedly intentional bait and switch, resulting in Hidden Oaks losing its right to appeal even the underlying notices of violation. As argued, therefore, this point of error is irrelevant, and we need not address it.

The second point involves the City's assertion that Hidden Oaks' procedural due process claim is unripe, citing *Williamson County Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 105 S.

For reasons unclear to us, the City did not raise the issue of an inconsistent verdict in its brief to this court. We therefore deem that issue waived. *See Melton v. Teachers Ins. and Annuity Ass'n of Am.*, 114 F.3d 557, 561 (5th Cir. 1997).[7] With regard to the remaining issues, we review the district court's denial of a motion for judgment as a matter of law *de novo*, assessing whether the evidence produced at trial provided a "legally sufficient . .

Ct. 3108, 87 L. Ed. 2d 126 (1985), and *Samaad v. City of Dallas*, 940 F.2d 925 (5th Cir. 1991). Again, however, the City has misunderstood the jury's procedural due process verdict. For while other circuits have held that *Williamson* may operate to bar a procedural due process claim, *see*, *e.g.*, *Bigelow v. Michigan Dep't of Natural Resources*, 970 F.2d 154 (6th Cir. 1992); *Harris v. Riverside County*, 904 F.2d 497 (9th Cir. 1990), those cases involve allegations of deprivations "ancillary" to or "arising from" a takings claim. *See Bigelow*, 970 F.2d at 160 (applying *Williamson* ripeness test to a procedural due process claim that the court found "ancillary" to the main issue of "whether the state properly denied full compensation to the plaintiffs for their fishing licenses"); *Harris*, 904 F.2d at 501 (holding procedural due process claim not subject to ripeness constraints because it did not "directly arise from, or rely on, [a] taking claim"). Here, however, the main thrust of Hidden Oaks' suit is not a claim for a taking. Indeed, both Hidden Oaks' federal and state takings claims were dismissed as a matter of law before the jury ever received the case. Instead, the main thrust of Hidden Oaks' complaint, as reflected by the jury's verdict, is the allegation that the City made a deal with Hidden Oaks which it then chose not to keep.

[7] We have found no case permitting us to raise the issue of inconsistent verdicts *sua sponte* on appeal. In *Brunner v. Maritime Overseas Corp.*, 779 F.2d 296 (5th Cir. 1986), we did hold that because a trial judge has "no authority" to enter judgment on an inconsistent verdict, failure to object to the jury instructions below would not prevent a litigant from arguing on appeal that the verdicts were inconsistent. *Id.* at 297. Nevertheless, *Brunner* provides no explicit support for creating an exception to the well-settled rule that arguments not raised on appeal are waived. *See*, *e.g.*, *Melton*, 114 F.3d at 561 ("This court has repeatedly stated that the brief of the appellant is required to contain a statement of the issues presented for review and an argument portion which analyzes and supports those contentions. Consequently, issues not raised or argued in the brief are considered waived and thus will not be noticed or entertained by this Court on appeal.")

. basis for a reasonable jury to find" as this particular jury did. FED. R. CIV. P. 50(a)(1). We review the district court's denial of a motion for a new trial only for a "clear abuse of discretion." *Dawsey v. Olin Corp.*, 782 F.2d 1254, 1261 (5th Cir. 1986). Questions of law receive *de novo* review. *USX Corp. v. Tanenbaum*, 868 F.2d 1455, 1457 (5th Cir.1989).

A

The City asserts that, as a matter of law, Hidden Oaks has demonstrated no valid property interest either in continued utility service or in lost rent. We disagree on both counts. The Fourteenth Amendment to the United States Constitution provides, in relevant part, that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV. In order to assert a violation of this amendment, one must at least demonstrate the deprivation of a protected "property interest" established through "some independent source such as state law." *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S. Ct. 2701, 2709, 33 L. Ed. 2d 548 (1972). Under this analysis, the "hallmark of property . . . is an individual entitlement grounded in state law, which cannot be removed except 'for cause.'" *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 430, 102 S. Ct. 1148, 1155, 71 L. Ed. 2d 265 (1982) (quoting *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 11–12, 98 S. Ct. 1554, 1561–62, 56 L. Ed. 2d 30 (1978)).

Texas law mandates that all utility providers "shall serve every consumer within [their] certified area and shall render

-19-

continuous and adequate service." TEX. WATER CODE ANN. § 13.250. Additionally, Texas law declares that utility providers "may not discontinue, reduce, or impair service to any part of [a] certificated service area except for: (1) nonpayment of charges; (2) nonuse; or (3) another similar reason that occurs in the usual course of business." TEX. UTIL. CODE ANN. § 37.152.[8] We find that these provisions demonstrate an entitlement to continuous and adequate utility service, which may be removed only "for cause." *See Burgess v. City of Houston*, 718 F.2d 151, 154 (5th Cir. 1983) (recognizing "a constitutionally protected right to continued utility service") (citing *Memphis Light*, 436 U.S. at 18, 98 S. Ct. at 1565).

The City claims, however, that this entitlement proves irrelevant here because the City is not disconnecting service to Hidden Oaks, but merely refusing to connect service to the incoming tenant. We find no merit in this distinction. This hypothetical incoming tenant, after all, has nothing to do with the City's decision not to provide utilities to the unit in question. Rather, it is the building's owner, Hidden Oaks, that is the cause of the

---

[8] The entirety of § 37.152 reads:

> (a) Unless the commission issues a certificate that the present and future convenience and necessity will not be adversely affected, a certificate holder may not discontinue, reduce, or impair service to any part of the holder's certificated service area except for: (1) nonpayment of charges; (2) nonuse; or (3) another similar reason that occurs in the usual course of business.
> (b) A discontinuance, reduction, or impairment of service must be in compliance with and subject to any condition or restriction the commission prescribes.

denial of connection.  In this context, the City can hardly claim that it is depriving the tenant, and not Hidden Oaks, of "continuous service" to its building.

We also find no merit in the City's assertion that Hidden Oaks has no constitutionally protected property interest in leasing Stoneridge.  Indeed, Texas recognizes that the ability to collect rent for the use of one's land is one of the most fundamental sticks in the bundle of rights termed "property."  *See F. Groos & Co. v. Chittim*, 100 S.W. 1006, 1010 (Tex. Civ. App. 1907, no writ) ("[T]he rents accruing from lands are, unless in some way severed from it, a part of the realty, and the right to them, as a part of the freehold, rests in him who has the title.").

As a matter of law, therefore, Texas recognizes entitlements both to continuous utility service and to "the rents accruing from land."  Given this holding, the district court did not err in denying the City's motion for judgment or abuse its discretion in denying the City's request for a new trial on this ground.

B

Moving to the jury's contract findings, the City cites several Texas cases in support of the proposition that, as a matter of law, contracts with the City are invalid until explicitly authorized by the City Council.  *See*, *e.g.*, *City of Greenville v. Emerson*, 740 S.W.2d 10, 13 (Tex. Civ. App. 1987, no writ).  Hidden Oaks does not dispute this argument directly, but rather asserts that the City

explicitly conceded the existence of a contract below.[9]

The support for this assertion in the record could not be more clear. At the charge conference, the district court suggested instructing the jury that "the City of Austin denies that any contract was ever formed between the City and the Plaintiff in September of 1994." The City objected. Explicitly asserting "that's not true," the City went on to explain that "the City is not contending that we didn't form a contract with the Plaintiff." Instead, the City asserted, "the issue [was] not did we have a contract, but what did the contract require."

Curiously, Hidden Oaks provides us with no authority indicating the legal consequences of this exchange. We find, however, that given the City's clear concession, made in open court and with the explicit intent to induce the district court's reliance, the City is judicially estopped from asserting that no contract existed. *See Ergo Science, Inc. v. Martin*, 73 F.3d 595, 598 (5th Cir. 1996) (holding that the doctrine of judicial estoppel, as a matter of federal procedure, entitles federal judges to rely on "statements made by counsel in open court relinquishing a specific claim"). Accordingly, we will not address the merits of

---

[9] Hidden Oaks also invites us to reject the City's claim of invalidity because the City has disingenuously asserted it for the first time on appeal. "Such infidelity," Hidden Oaks opines, "mocks the orderly administration of justice, and calls into question the candor of its proponent." While articulated with admirable fervor, Hidden Oaks might wish to save such righteous indignation for a nobler cause. The City did, in fact, raise this argument below, not only in its pre-trial Reply to Plaintiffs' Original Complaint, but also in its post-trial Motion for New Trial and Renewed Motion for Judgment.

the City's "invalid without authorization" argument.

C

The City also claims that even if the jury correctly found that a contract existed, the contract as found by the jury could not be enforceable because it would bargain away the City's governmental power to enforce the housing code. *See Clear Lake City Water Auth. v. Clear Lake Utils. Co.*, 549 S.W.2d 385, 391 (Tex. 1977) (holding that a municipality may not "by contract or otherwise, bind itself in such a way as to restrict [the] free exercise of [its] governmental powers"); *accord Joleewu, Ltd. v. City of Austin*, 916 F.2d 250, 255 (5th Cir. 1990). We disagree.

Not every contract made by a municipality relating to its governmental functions violates the rule of *Clear Lake City*. Instead, the ultimate test concerns whether the contract at issue will, as a matter of law, "potentially control or embarrass the City in the exercise" of these powers. *Cibolo Creek Mun. Auth. v. City of Universal City*, 568 S.W.2d 699, 702 (Tex. Civ. App. 1978, writ ref'd n.r.e.). Here, the contract as found by the jury states only that as long as Hidden Oaks adheres to a certain schedule of repairs (and withdraws its challenge to the City's findings of code violations), the City will not impose utility holds related to the current Notices of Violation. The contract does not mandate that the City may never again impose utility holds on Stoneridge, nor does it even purport to address, much less limit, the City's inherent power to find code violations at Stoneridge in the future.

In addition, because Hidden Oaks, as the owner of the

-23-

apartment complex, is an "end user" of the City's utility service, the rule of *Clear Lake City* would not apply. *See Brubaker v. Brookshire Mun. Water Dist.*, 808 S.W.2d 129, 132 (Tex. App. 1991, no writ) (declining to apply *Clear Lake City* to plaintiffs because, as owners of an apartment complex denied water and sewer service in violation of an alleged oral agreement, they were "end users" of the utility service, as opposed to the plaintiff in *Clear Lake City*, which was itself a utility company and an intermediate provider of service).

D

Even assuming that a contract did exist, however, and that it could be enforced, the City asserts that the text and surrounding circumstances of the September 1994 letter agreement support only a finding that the City agreed to refrain from placing "any further" utility holds on Stoneridge, not that the City agreed to remove any utility holds already in place. As a general rule, "the interpretation of a contract is a question of law, not fact." *Thornton v. Bean Contracting Co.*, 592 F.2d 1287, 1290 (5th Cir. 1980). Even so, an exception to this rule applies when "extrinsic evidence has been used in interpreting an ambiguous contract." *Id.* Whether a contract term is indeed ambiguous is a question of law, but once we determine legal ambiguity, the fact finder's interpretation deserves traditional deference. *See Paragon Resources, Inc. v. National Fuel Gas Distrib. Corp.*, 695 F.2d 991, 995 (5th Cir. 1983).

Here, the district court made an implicit finding of legal

ambiguity by instructing the jury that "[i]n deciding whether the parties reached an agreement, you may consider what they wrote, said and did in light of the surrounding circumstances, including any earlier course of dealing." Moreover, in attempting to clarify the parties' positions for the jury, the district court noted that Hidden Oaks interpreted the September 1994 letter agreement to mean that the City, in return for certain promises from Hidden Oaks, generally would not "use" utility holds on Stoneridge in order to force compliance with the outstanding notices of violation. The City, on the other hand, interpreted the September 1994 letter agreement to mean only that the City would not use the outstanding notices of violation to place additional holds on Stoneridge, beyond those holds already imposed as of the date of the agreement.

Applying these instructions to the facts, the jury found both that a contract existed and that the City had breached that contract by refusing to remove utility holds from Stoneridge. In doing so, the jury rejected the City's characterization of the September 1994 letter agreement—specifically, the City's suggestion that it had promised only to refrain from placing future holds and not to remove any holds already in place.

Insofar as the City relies on the text of the September 1994 letter agreement to support a reversal of the jury's verdict, we construe this argument as an attack on the district court's legal conclusion that the language of the September 1994 letter agreement was ambiguous, and in need of extrinsic evidence to determine the true intent of the parties. So construed, we find the City's

argument meritless.  As the ambiguity of a contract is a question of law, we review the district court's determination *de novo*.  *See Jhaver v. Zapata Off-Shore Co.*, 903 F.2d 381, 383 (5th Cir. 1990). We affirm as long as the language at issue is "reasonably susceptible to more than one meaning." *Constitution State Ins. Co. v. Iso-Tex Inc.*, 61 F.3d 405, 408 (5th Cir. 1995).

The September 1994 letter agreement reads, in relevant part: "this proposal will . . . avoid any further necessity of threatened utility holds."  Depending on whether one emphasizes the words "any further" or the word "threatened," one might come to different conclusions about the content (and timing) of the City's promise. "Any further" tends to indicate that some holds might already be in place, while "threatened" as a modifier of "utility holds" tends to indicate quite the opposite.  We therefore affirm the district court's holding that the contract is ambiguous.

Insofar as the City also challenges the verdict by asserting error in the district court's denial of its motion for judgment as a matter of law, we construe this assertion of error as a challenge to the legal sufficiency of the evidence.  *See Hiltgen v. Sumrall*, 47 F.3d 695, 699 (5th Cir. 1995).  We therefore review the district court's denial of the motion *de novo*, reversing that denial only when "there is no legally sufficient evidentiary basis for a reasonable jury to find" as this particular jury did.  *Id.* at 700. In conducting this review, we must remember that "we are not free to reweigh the evidence or to re-evaluate the credibility of witnesses."  *Id.*  Instead, we must accept any reasonable factual

inferences made by the jury, being careful not to "substitute . . . other inferences that we may regard as more reasonable." *Id*.

The testimony at trial established that the City's original hold, placed on or about the date of the September 1994 letter agreement, covered every unit in the Stoneridge complex. Based on this fact, the jury might reasonably infer that a promise merely not to impose "further" or "additional" holds on Stoneridge would make no sense. At that point, after all, the City could do nothing "further" in the way of utility holds but remove them. In addition, the testimony at trial also established that at the time the parties executed the September 1994 letter agreement, neither McLelland nor Hersch understood that Stoneridge already suffered from a utility hold. Based on this fact, the jury again might reasonably infer that the distinction proffered by the City—between holds already imposed and holds yet to be imposed—was not what the parties had in mind when they formed the September 1994 letter agreement.

Because these factual inference are reasonable and supported by the evidence, we do not find it implausible that a reasonable jury would determine, as this jury did, that the City promised in the September 1994 letter agreement to remove any utility holds already in place. We therefore hold that the district court did not err in denying the City's motion for judgment as a matter of law with respect to the contract claim.[10]

---

[10] In support of its claim of legally insufficient evidence, the City also cites *Gulf Coast Farmers Coop. v. Valley Co-op Mill*, 572 S.W.2d 726 (Tex. Civ. App. 1978, no writ), for the proposition

With regard to the district court's denial of the City's motion for a new trial on the breach of contract claim, we note that our standard of review here is even more deferential than our review of the denial of a motion for judgment as a matter of law. *See Hiltgen*, 47 F.3d at 703. Absent "a clear showing of an abuse of discretion," we will not reverse the trial court's decision to deny a new trial. *Dawsey v. Olin Corp.*, 782 F.2d 1254, 1261 (5th Cir. 1986). In order to make such a "clear showing," the City would have to demonstrate "an absolute absence of evidence to support the jury's verdict," thus indicating that the trial court had abused its discretion in refusing to find the jury's verdict "contrary to the great weight of the evidence." *Id.* at 1262; *Robin*, 719 F.2d at 98. In light of our previous holding that the district court correctly denied the City's motion for judgment as a matter of law on the breach of contract claim, we find no abuse of discretion in the district court's denial of the City's motion for a new trial. *See Hiltgen*, 47 F.3d at 703.

## VII

Having found that the City had breached its contract with Hidden Oaks, the jury returned a verdict for $231,089 in damages, which was precisely the amount Hidden Oaks claimed it had suffered

---

that an offer and acceptance must be "clear and definite" in order to form a contract. *Id.* at 737. To the extent that this argument challenges the existence of a contract, it is foreclosed by judicial estoppel, as discussed above. To the extent that this argument relates merely to the clarity of the parties' agreement, we note that the City's own witness, Stuart Hersch, admitted on cross-examination that the September 1994 letter agreement was "clear" that Hidden Oaks was "looking to avoid utility holds being placed on the property."

in lost rent.  Both the City and Hidden Oaks appeal this award—the City alleging that the jury had insufficient evidence on which to base its decision and Hidden Oaks arguing that the district court erroneously limited the types of damage the jury could consider in arriving at its final figure.  We find no merit in Hidden Oaks' allegations of error, but agree with the City that insufficient evidence supports the jury's verdict on damages.

In attacking the damage award, Hidden Oaks asserts that the district court's instructions and evidentiary rulings prevented the jury from considering two additional types of damage: (1) lost re-sale value of the property because of the "stigma" of the utility holds, and (2) unnecessary repairs made in an effort to convince the City to lift the holds.  We review challenges to the district court's jury instructions in order to determine if "the charge as a whole" creates a "substantial" doubt, incapable of eradication, as to whether the jury has been "properly guided in its deliberations."  *Russell v. Plano Bank and Trust*, 130 F.3d 715, 719 (5th Cir. 1997) (internal quotation marks and citations omitted).[11] We review the trial court's evidentiary rulings for an abuse of discretion. *See Kelly v. Boeing Petroleum Serv.*, 61 F.3d 350, 356 (5th Cir. 1995).

In instructing the jury on breach-of-contract damages, the district court directed that the jury should "consider only the

---

[11] *Russell* also provides that even assuming we find such doubt, "we will not reverse if we determine, based upon the entire record, that the challenged instruction could not have affected the outcome of the case."  *Id.* at 719 (quoting *FDIC v. Mijalis*, 15 F.3d 1314, 1318 (5th Cir.1994)).

. . .[r]ents lost, if any, between the day the contract was breached and the day the utility holds that were placed on Stoneridge in August or September 1994 were released." Hidden Oaks complains that this instruction prevented the jury from considering the evidence introduced at trial as to unnecessary repairs. Because Hidden Oaks failed to object to this instruction at trial, it has waived this claim. *See Tandy Brands Inc. v. Harper*, 760 F.2d 648, 653 (5th Cir. 1985) (finding that defendant had waived any error resulting from the trial court's failure to instruct the jury on a specific claim when defendant did not object to this omission in the instructions).

With regard to the lost value claim, Hidden Oaks argues that the district court erred in refusing to permit the opinion testimony of Jim Maloney as to how the City's wrongful imposition of utility holds had lowered Stoneridge's market value below what it would have been without the holds. The district court consistently sustained the City's objections to this testimony because the court found Maloney unqualified to testify as an expert in appraising property.

In challenging this decision, Hidden Oaks bears a heavy burden. Trial courts have "wide discretion" in deciding whether or not a particular witness qualifies as an expert under the Federal Rules of Evidence. *See* FED. R. EVID. 702 (providing that a witness may qualify as "expert" through "knowledge, skill, experience, training, or education."); *Ellis v. K-Lan Co.*, 695 F.2d 157, 162 (5th Cir. 1983). The district court heard a substantial amount of

testimony from Maloney, both with and without the jury, in an attempt to determine his qualifications. Hidden Oaks elicited testimony that Maloney visited Austin about once a month to purchase and sell property for his employer, Cunningham Capital, and that part of his job was to evaluate the worth of various properties in order to determine if Cunningham should make an offer and at what price. On cross examination, the City elicited testimony that Maloney was not a licensed appraiser in any state, nor was he a licensed real estate broker. In addition, Maloney had no formal schooling in the methods of appraisal and was unable to respond fully to the City attorney's questions regarding standard appraisal theory. In light of these concessions, the district court acted well within its discretion in refusing to permit Maloney to testify as an expert regarding the worth of Stoneridge. *See United States v. 60.14 Acres of Land*, 362 F.2d 660, 668 (3d Cir. 1966) ("[T]he essential elements of the real estate expert's competency include his knowledge of the property and of the real estate market in which it is situated, *as well as* his evaluating skill and experience as an appraiser.") (emphasis added) (quoted favorably in *United States v. 71.29 Acres of Land*, 376 F. Supp. 1221, 1226 (W.D. La. 1974)).

Hidden Oaks argues in the alternative that the district court erred by not permitting Maloney to testify at least as an owner regarding the value of the property at different times. Hidden Oaks correctly points out that we adhere to the general rule that an owner always may testify as to value, whether assessed as of the

time of trial, or at some definitive point in the past. *See United States v. 329.73 Acres of Land*, 666 F.2d 281, 284 (5th Cir. 1982), *reh'g granted and rev'd on other grounds*, 704 F.2d 800 (5th Cir. 1983) (rejecting appellant's attack on the probative value of a landowner's testimony regarding the value of his land before and after the imposition of a flowage easement because appellant's argument "overlooks the fact that the opinion testimony of a landowner as to the value of his land is admissible without further qualification").

Here, however, the trial court not only permitted Hidden Oaks to ask Maloney, as an owner, what he thought the property was worth today, but also ruled that Hidden Oaks could ask Maloney what he, as an owner, thought the property was worth in 1994, before the utility holds went on. Hidden Oaks nevertheless made a deliberate decision not to ask Maloney about the property value in 1994, and even objected when the City attorney attempted to cross-examine Maloney on this issue.[12] Having made such a choice at trial, Hidden Oaks hardly can request now that we reverse and remand in order for it to reassess its earlier strategy.

The City, on the other hand, urges that the district court erred in denying its motion for a new trial on damages because the award was speculative and supported by "no evidence." As noted above, we will reverse a district court's denial of a motion for a

---

[12] The reason for this omission appears to lie in the fact that the resale value of Stoneridge had in fact increased from 1994 to the time of trial, just not as much as Hidden Oaks would have expected.

new trial only upon a "clear showing of an abuse of discretion." *See Dawsey*, 782 F.2d at 1261. In order to make such a "clear showing," the City would need to demonstrate "an absolute absence of evidence to support the jury's verdict." *Id.*

Here, in support of its request for $231,089 in damages flowing from lost rent, Hidden Oaks relied solely on the testimony of Jim Maloney, senior vice-president of Cunningham Capital Corporation. Maloney testified that he arrived at the $231,089 figure by calculating the rent Hidden Oaks should have been able to collect from September 1994 to December 1995 and then subtracting out Hidden Oaks's actual gross receipts for that time period. From September through December 1994, Maloney calculated the rent Hidden Oaks should have received by multiplying the rentable square footage at Stoneridge times $.74, which was the rent per square foot being charged at Stoneridge in July 1994. For January through December 1995, Maloney multiplied the rentable square footage at Stoneridge times $.78 per square foot, which Maloney alleged was the "market rent" during this time period. The resulting amounts represented what Hidden Oaks should have made per month during the relevant time period if Stoneridge had (a) been able to charge the "average" rate for its apartments throughout 1995 and (b) enjoyed a 100% occupancy rate. These monthly figures, added together, represented the total amount that Hidden Oaks thought it should have taken in from September 1994 to December 1995.

Maloney then subtracted 5% off this total, making the assumption that throughout the period of damage, Hidden Oaks would

-33-

have enjoyed a 95% rather than a 100% occupancy rate. On cross-examination, Maloney admitted that Stoneridge was only 60% occupied when Cunningham bought the property and reached a high of only 93% occupancy before the imposition of the utility holds. Nevertheless, Maloney defended his assumption of 95% occupancy by pointing to the market average in Austin at the time of trial.

At the outset, we question whether these calculations accurately depict the gross income Hidden Oaks could have expected to receive from September 1994 to December 1995. Hidden Oaks introduced no evidence at trial that Stoneridge ever had enjoyed an occupancy rate as high as 95%, or had occupancy rates comparable to the market average. Indeed, all the testimony regarding occupancy rates indicated that Stoneridge had a history of severe problems filling its units.

More problematic is Hidden Oaks's complete lack of evidence tying the unrented apartments to the City's imposition of utility holds. Given that the property had not performed to market expectations in the past, Hidden Oaks could not simply cite market statistics and assume that any differentiation in actual income was the result of the utility holds. *See City of Denton v. Weems*, 456 S.W.2d 207, 210 (Tex. Civ. App. 1970, writ ref'd n.r.e.) (finding plaintiff's alleged damages for lost apartment rentals speculative because "[n]one of the reported damages [were] tied to the termination of electrical current," and "[t]here was no evidence that [any potential tenants] saw the apartment or would consider renting it"); *cf. Marks v. Pan Am. World Airways, Inc.*, 785 F.2d

539, 542 (5th Cir. 1986) (affirming district court's grant of judgment notwithstanding the verdict when testimony from expert economist was "merely speculative").  We find such assumptions particularly troubling in light of certain evidence introduced at trial indicating that Hidden Oaks could have readily determined which units suffered utility holds at which times simply by consulting the apartment manager or by calling the City utility office. *See Richter, S.A. v. Bank of Am. Nat'l Trust & Sav. Ass'n*, 939 F.2d 1176, 1188 (5th Cir. 1991) (rejecting a requirement of "mathematical precision" in proving damages, but noting that Texas law requires one to "bring forward the best evidence of the damage of which the situation admits, [providing] some basis for reasonable inferences").

Thus, because Hidden Oaks produced "absolutely no evidence" indicating that the vacancies at Stoneridge were due solely or even primarily to the City's imposition of utility holds, we reverse the district court's denial of the City's motion for a new trial on contract damages.  On remand, Hidden Oaks should produce whatever evidence it may have in its possession relating to which units at Stoneridge remained vacant and why.  Without this information, we cannot allow the jury to simply assume that a complex with a history of vacancy problems suddenly would perform up to market standards, but for the City's breach of contract.  We therefore vacate the contractual damage award and remand for further proceedings in accordance with this opinion.

VI

After the jury returned its verdict, both the City and Hidden Oaks moved for an award of attorney's fees under 42 U.S.C. § 1988, both parties alleging that they had prevailed on the claim of procedural due process and the City requesting additional fees as the prevailing party on Hidden Oaks's claims under the federal takings clause and the substantive component of the due process clause.  The district court denied the motions of both parties, and we affirm.

Section 1988 provides that a court "in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the costs."  42 U.S.C. § 1988.  Even a plaintiff who wins only nominal damages qualifies as such a "prevailing party." *Farrar v. Hobby*, 506 U.S. 103, 112, 113 S. Ct. 566, 573, 121 L. Ed. 2d 494 (1992).  Nevertheless, in determining the reasonableness of a fee award, courts must consider "the degree of the plaintiff's overall success," recognizing that often a plaintiff who "seeks compensatory damages but receives no more than nominal damages" will be the kind of prevailing party that merits no attorney's fee at all.  *Id.* at 114-15, 574-75 (quoting *Texas State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 793, 109 S. Ct. 1486, 1494, 103 L. Ed. 2d 866 (1989)).  In assessing the district court's application of these standards, we review only for an abuse of discretion.  *See United States v. Mississippi*, 921 F.2d 604, 609 (5th Cir. 1991).

With regard to Hidden Oaks's request for fees as a prevailing party on the procedural due process claim, we find that the

district court acted well within its discretion by denying this request. The district court instructed the jury to award only nominal damages on this claim because Hidden Oaks produced no evidence at trial indicating any damage specifically arising from the procedural due process violation. *See Farrar*, 506 U.S. at 115 ("In a civil rights suit for damages . . . the awarding of nominal damages . . . highlights the plaintiff's failure to prove actual, compensable injury."); *cf. Riley v. City of Jackson*, 99 F.3d 757, 760 (5th Cir. 1996) (distinguishing *Farrar* where plaintiff primarily sought and obtained injunctive relief, in addition to winning an award of nominal damages). Moreover, Hidden Oaks's victory produced no "public benefit" justifying an award of fees in spite of receiving only nominal damages. *See Farrar*, 506 U.S. at 121 (O'Connor, J., concurring) (noting that an award of merely nominal damages may support an award of fees when the litigation has "accomplished some public goal"). Indeed, as the district court noted, the procedural due process violation as found by the jury was peculiar to Hidden Oaks, not general in the sense that the City would be forced to change its dealings with other landowners as a result. On these facts, therefore, we find that the jury's award of nominal damages to Hidden Oaks on its procedural due process claim gave Hidden Oaks little more than "the moral satisfaction of knowing that a federal court concluded that [its] rights had been violated." *Hewitt v. Helms*, 482 U.S. 755, 762, 107 S. Ct. 2672, 2676, 96 L. Ed. 2d 654 (1987). Accordingly, we affirm the district court's denial of § 1988 attorney's fees to Hidden

Oaks.

The City also alleges error in the district court's § 1988 rulings, claiming that the City should receive fees as the "prevailing party" on Hidden Oaks's claims under the federal takings clause and the substantive component of the due process clause. Unlike prevailing plaintiffs, however, who are generally entitled to § 1988 fees absent special circumstances, prevailing defendants cannot recover § 1988 fees without demonstrating that the plaintiff's underlying claim was frivolous, unreasonable or groundless. *See United States v. Mississippi*, 921 F.2d at 609 (citing *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 422, 98 S. Ct. 694, 700, 54 L. Ed. 2d 648 (1978)).

Here, the City noted in its motion for attorney's fees that the district court granted both its motion to dismiss Hidden Oaks's federal takings claim, and its motion for judgment as a matter of law with respect to Hidden Oaks's claim for a violation of substantive due process. These rulings, however, do not establish that the underlying claims were "frivolous, unreasonable or groundless." *See Hughes v. Rowe*, 449 U.S. 5, 15-16 (1980) ("The fact that the Court dismissed Plaintiffs' suit is not in itself a sufficient justification for the fee award."). Other than pointing out these rulings, the City made no argument to the district court that Hidden Oaks's claims were frivolous in the sense required by *Christiansburg*. We cannot say, therefore, that the district court abused its discretion in denying the City's motion for § 1988 fees.

VIII

In summary, we affirm the district court in all respects except in its denial of the City's motion for a new trial on contract damages.  Thus, we affirm the district court's dismissal without prejudice of Hidden Oaks's federal takings claim;  we affirm the district court's dismissal with prejudice of Hidden Oaks's claims under Article I, § 17 of the Texas Constitution and the substantive component of the Fourteenth Amendment due process clause;  we affirm the judgment of the district court as to liability and attorney's fees on the breach of contract claim;  we affirm the judgment of the district court as to liability and damages on the procedural due process claim; and we affirm the judgment of the district court as to attorney's fees under § 1988. With regard to the district court's judgment as to damages on Hidden Oaks's breach of contract claim, however, we reverse the court's decision to deny the City's motion for a new trial on damages, vacate the damage award, and remand to the district court for further proceedings consistent with this opinion.