**Dr. Warren HELLER, et al., on behalf of a class of persons similarly situated, and on behalf and in the name of the nominal defendants, Plaintiffs,**

v.

**AMERICAN INDUSTRIAL PROPERTIES REIT, et al., Defendants.**

No. CivASA–97–CA–1315–EP.

United States District Court,
W.D. Texas,
San Antonio Division.

Feb. 3, 2000.

Roy R. Barrera, Jr., Nicholas & Barrera, San Antonio, TX, Roger B. Greenberg, David E. Sharp, Greenberg, Peden, Siegmyer & Oshman, Houston, TX, Lynda

J. Grant, Robert N. Cappucci, David J. Goldsmith, Goodkind, Labaton, Rudoff & Sucharow, New York City, Andrew S. Friedman, Bonnett, Fairbourn, Friedman & Balint, P.C., Phoenix, AZ, Joel H. Bernstein, Andrew D. Friedman, Wechsler, Harwood, Halobian & Feffer, New York City, Leigh R. Lasky, Lasky & Rifkind, Ltd., Chicago, IL, Steven A. Schwartz, Chimicles & Tikellis, Haverford, PA, for Dr. Warren Heller.

D. Mitchell McFarland, Liddell, Sapp & Zivley, Hill & LaBoon, L.L.P., Houston, TX, James A. Ryan, Streich, Lang, P.A., Phoenix, AZ, for American Industrial Properties Reit.

Patricia J. Villareal, Thomas R. Jackson, Jones, Day, Reavis & Pogue, Dallas, TX, Gary L. Birnbaum, Mariscal, Weeks, McIntyre & Friedlander, P.A., Phoenix, AZ, for USAA Real Estate Company, USAA Properties I, Inc., USAA Properties II, Inc., USAA Properties III, Inc., USAA Properties IV, Inc., USAA Real Estate Income Investments I, Limited Partnership, USAA Real Estate Income Investments II, Limited Partnership, USAA Real Estate Income Investments III, Limited Partnership, and USAA Real Estate Income Investments IV, Limited Partnership.

Ricardo G. Cedillo, Davis, Adami, & Cedillo, Inc., San Antonio, TX, Terence M. Murphy, Jones, Day, Reavis & Pogue, Dallas, TX, Patricia J. Villareal, Thomas R. Jackson, Jones, Day, Reavis & Pogue, Dallas, TX, Gary L. Birnbaum, Mariscal, Weeks, McIntyre & Friedlander, P.A., Phoenix, AZ, for Edward B. Kelly, T. Patrick Duncan, and Randal R. Seewald.

## ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

PRADO, District Judge.

On this date the Court considered the summary judgment motions of Defendants USAA Properties and American Industrial Properties Inc. (AIP), and Plaintiffs' responses to those motions. After careful consideration the Court has concluded that the Plaintiffs cannot establish an essential element of their claims—damages. For that reason, the motions for summary judgment will be granted, and this case will be dismissed. Because the failure to establish damages is the basis for dismissal, the Court will address only that issue, the request for an accounting, and the preliminary question of standing.

### FACTS AND PROCEDURAL HISTORY

In this suit, Plaintiffs seek legal and equitable relief for alleged violations of federal securities law, 15 U.S.C. § 78n(a), and for breach of fiduciary duty, arising from the merger of four USAA limited partnerships with Defendant American Industrial Properties (AIP). Included in their claims is a request for an accounting.

In 1997, the General Partners, all subsidiaries of USAA Real Estate Company, began winding up the affairs of the four partnerships that are the subject of this suit, pursuing plans to include the partnerships in a merger with AIP, trading partnership units for shares in the newly formed entities. A majority of the Limited Partners approved this "roll-up" transaction in January 1998. However, even before the merger was accomplished, several Limited Partners initiated this suit, claiming that the proxy materials related to the merger made material misrepresentations and omissions and that the General Partners breached their fiduciary duties to the Limited Partners in pursuing the merger to the exclusion of other deals. In September 1999, this Court dismissed Plaintiffs' claims of securities fraud. Both

Defendants now move for summary judgment.

## SUMMARY JUDGMENT STANDARD

In the usual case, the party who seeks summary judgment must show by affidavit or other evidentiary materials that there is no genuine dispute as to any fact material to resolution of the motion. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 n. 4, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Lavespere v. Niagara Machine & Tool Works, Inc.,* 910 F.2d 167, 178 (5th Cir.1990); *Fontenot v. Upjohn Co.,* 780 F.2d 1190, 1194 (5th Cir.1986). To satisfy this burden, the movant must either submit evidentiary documents that negate the existence of some material element of the nonmoving party's claim or defense or, if the crucial issue is one for which the nonmoving party will bear the burden of proof at trial, merely point out that the evidentiary documents in the record contain insufficient proof concerning an essential element of the nonmoving party's claim or defense. *See Celotex Corp.,* 477 U.S. at 325, 106 S.Ct. 2548; *Lavespere,* 910 F.2d at 178.

Once the moving party has carried that burden, the burden shifts to the nonmoving party to show that summary judgment is not appropriate. The nonmoving party cannot discharge this burden by referring to the mere allegations or denials of the nonmoving party's pleadings; rather, that party must, either by submitting opposing evidentiary documents or by referring to evidentiary documents already in the record, set out specific facts showing that a genuine issue exists. *See Celotex,* 477 U.S.

at 324, 106 S.Ct. 2548. In order for a court to find there are no genuine material factual issues, the court must be satisfied that no reasonable trier of fact could have found for the nonmoving party or, in other words, that the evidence favoring the nonmoving party is insufficient to enable a reasonable jury to return a verdict for the nonmovant. *See Liberty Lobby,* 477 U.S. at 249–50, 106 S.Ct. 2505; FED.R.CIV.P. 56(e).

Where the party opposing the motion for summary judgment will have the burden of proof on an essential element of his case at trial and does not, after adequate time for discovery, make a showing sufficient to establish the existence of that element, summary judgment may be entered against him. *Celotex,* 477 U.S. at 322–24, 106 S.Ct. 2548; *Fontenot,* 780 F.2d at 1194–95.

## STANDING

■ The Defendants argue that the Plaintiffs here do not have standing to bring their derivative claims because the named Plaintiffs no longer hold stock in the post-merger entity, AIP. This Court addressed that issue in its Order on Defendants' motion to dismiss, finding that standing existed here because the Plaintiffs lost their stock as the result of a merger they claim was fraudulent. The Court still believes the Plaintiffs have standing. However, the Court finds that such standing is more properly grounded in the Plaintiffs' status as former Limited Partners complaining that the General Partners breached a fiduciary relationship owed them.[1] Under the limited partner-

---

1. Oddly, this case has been tried as a shareholders' derivative lawsuit from its inception. Much of the Plaintiffs' arguments regarding fiduciary duty stem from one case, *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.,* 506 A.2d 173 (Del.1985), which involves *a corporation's fiduciary duties to its shareholders upon corporate dissolution or change in control.* In fact, however, this is a suit brought by limited partners, who became

ship statute governing each agreement here, standing is given at least to individuals who held limited partnership status as the time of the transaction and at the time suit was instigated. *See* CAL.CORP.CODE §§ 15701, 15702; 6 DEL.C. § 17–102; TEX. REV.CIV.STAT.ANN. Art. 6132a–1, §§ 10.01, 10.02; Plaintiffs here satisfy those requirements.

## DAMAGES

An essential element of any claim in a civil lawsuit is damages. *See Parklane Hosiery Co., Inc. v. Shore,* 439 U.S. 322, 325 n. 2, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979) (securities claims); *Servicios–Expoarma, C.A. v. Industrial Maritime Carriers, Inc.,* 135 F.3d 984, 995 (5th Cir.1998) (generally). The summary judgment standards set forth in *Celotex* and *Anderson* apply equally to the issue of damages. *Morgan Creek Prod., Inc. v. Capital Cities/ABC, Inc.,* No. CV–89–5463–RSWL (JRX), 1991 WL 352619, at *16 (C.D.Cal. 1991). Damages need not be proved with precision; however, there must be before the factfinder sufficient credible, reliable evidence to support a reasonable inference of the amount of damages the plaintiff has incurred. *See Hidden Oaks Ltd. v. City of Austin,* 138 F.3d 1036, 1052 (5th Cir.1998). In this case, Plaintiffs have failed to produce such evidence at the close of discovery, and accordingly this Court will grant summary judgment to the Defendants.

Plaintiff's expert in this case, Kurt Kroboth, assesses the damages suffered by the Plaintiffs as the difference between what the sale value of the partnership properties and the stock the partners received as a result of the merger. Alternatively, Kroboth argues that damages are the difference between the value of the consideration the partners received in the merger and the amount the partners might have received in an alternate transaction. To calculate these damages, Kroboth acknowledges that he must rely upon two crucial variables—the "actual" value of the partnerships properties in a contemporaneous sale and the "actual" value of AIP stock on the date of the transaction. A third value is also critical—the value of the alleged alternate transactions.[2] However, Kroboth's calculations of each of these variables are materially flawed.

## THE FEDERAL RULES, *DAUBERT*, AND RELIABILITY

The Federal Rules of Evidence permit the use of expert testimony when such testimony will assist the trier of fact to understand the evidence or to determine a fact issue. FED.R.EVID. 702. A witness must be qualified to testify as an expert by virtue of his or her knowledge, skill, experience, training, or education. *Id.* Further, the rules contemplate that in giving testimony, an expert may rely on three types of facts or data: those perceived directly by the expert, those made known to the expert during the trial, and those made known to the expert before trial and based on something other than the expert's own perception. *See* FED.R.EVID.

shareholders only by virtue of the very roll-up transaction of which they complain. Had the Court addressed the duties at issue here, it would necessarily have focused on those duties owed by a general partner to its limited partners. *See In re Marriott Hotel Properties II Limited Partnership Unitholders Litigation,* No. 14961, 1996 WL 342040 (Del.Ch.1996) (discussing *Revlon* duties in partnership context). *Cf. In re Integrated Resources, Inc.* No. 90–B–10411 (CB), 1990 WL 325414, at *11

(Bankr.S.D.N.Y.1990) (discussing lesser duty shareholder that is also corporation has to minority shareholders in subsidiary corporation).

**2.** Kroboth assumes this amount is reasonably equivalent to the actual worth of the properties, as he uses alternate bids to determine that worth.

703. If the evidence relied upon by the expert is inadmissible, then it must be data that is "reasonably relied upon by experts in the particular field." *Id.* In addition, a trier of fact must determine whether there are good grounds to rely on this data to draw the conclusion reached by the expert. *In re Paoli R.R. Yard PCB Litigation,* 35 F.3d 717, 749 (3d Cir.1994). At all times the admissibility of the evidence must be governed by a consideration of whether it will aid the trier of fact. *See* FED.R.EVID. 702.

Rule 702 was interpreted by the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). In that opinion, the Court held that expert scientific testimony must be "ground[ed] in the methods and procedures of science" and based on "more than a subjective belief or unsupported speculation." *Daubert,* 509 U.S. at 590, 113 S.Ct. 2786; *see Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (applying *Daubert* principles to non-scientific expert testimony). The Supreme Court explained that proposed testimony must be supported by appropriate validation—i.e., "good grounds," based on what is known. *See Allen v. Pennsylvania Eng'g Corp.,* 102 F.3d 194, 196 (5th Cir.1996). To be admissible under the *Daubert* standard, an expert's opinion must have a "reliable basis in the knowledge and experience of his discipline." *Allen,* 102 F.3d at 196; *see Daubert,* 509 U.S. at 590, 113 S.Ct. 2786.

Accordingly, the Fifth Circuit directs a district court to determine that the reasoning and methodology underlying a proffered expert opinion are scientifically valid and that the reasoning and methodology can properly be applied to the facts in issue. *Daubert,* 509 U.S. at 590–92, 113 S.Ct. 2786. This means that, for each and every conclusion contained in the expert's proposed testimony, the Court must determine if the methodology leading to that conclusion is sound. *See Allen,* 102 F.3d at 196 (holding that a trial court specifically must determine that the reasoning and methodology underlying the testimony are scientifically valid).

The hallmarks of sound methodology are spelled out in *Daubert.* Of primary importance is whether a hypothesis is testable and has been tested. Secondary to this consideration is whether the theory or technique has been subject to peer review, the rate of error contained within a particular technique, and whether the hypothesis or technique is generally accepted. *Daubert,* 509 U.S. at 593–94, 113 S.Ct. 2786. In *Kumho,* the United States Supreme Court recognized that these factors are flexible and may or may not apply in every case. *Kumho,* 119 S.Ct. at 1175.

### KROBOTH'S QUALIFICATIONS

The Court agrees with the Defendants that Kroboth is not qualified under the rules to speak as an expert on real estate values. Kroboth is not a real estate appraiser; when, in his career, he has been asked to form opinions about the value of real estate, he has relied upon other appraisers. *See Hidden Oaks,* 138 F.3d at 1050 (discussing qualifications necessary to serve as expert real estate appraiser). Nothing in the evidence suggests that Kroboth himself is qualified to make the valuations he has made in putting together his expert report. *See id; United States v. 60.14 Acres of Land,* 362 F.2d 660, 668 (3d Cir.1966) (setting forth qualifications for real estate expert).

### RELIABILITY

■ The Court also finds that significant and material portions of Kroboth's proposed testimony, even if he were qualified, would be barred as unreliable. In considering this question, the Court has

reviewed Kroboth's opinions regarding the value of the partnership properties and his opinion regarding the value of AIP's post-merger stock.

## VALUE OF THE PROPERTIES

**Internal Valuations**

In arriving at a conclusion about the value of the partnerships' properties, Kroboth relied, in part, on certain internal valuations made by USAA representatives prior to and during the course of merger negotiations with AIP. The Court finds that these internal valuations carry with them no indicia of reliability. There is no evidence in the record regarding the methodology relied upon to reach those figures and certainly no evidence that the valuations were performed by a qualified real estate appraiser.[3] Kroboth himself does not know how the figures were arrived at. There is no evidence in the record that the figures are anything more than negotiating tools in the AIP merger, which seriously undermines their objectivity and thus their reliability.

Of course, as the Plaintiffs argue, an expert may utilize the work of others in reaching his opinion. *See Moore v. Ashland*, 126 F.3d 679, 696 (5th Cir.1997),

*rev'd on other grounds*, 151 F.3d 269. However, Plaintiffs have offered no support for their assumption that a real estate expert may, as a method of appraisal, simply borrow figures arrived at after an unexamined, untested, arguably biased internal valuation process. *See Flynn v. Bass Bros. Enterprises, Inc.*, 744 F.2d 978, 989 (3d Cir.1984) (questioning reliability of internal valuations).

**Other Bids**

Kroboth also relied upon the bids of competitors Burack and Glenborough to determine the value of the partnership properties. While the use of bids to determine value may be an accepted methodology in real estate appraisal, the Court finds that, in this case, Kroboth's methodology is unreliable because it inexcusably ignores facts, available to Kroboth, that undermine the significance of the bids and also because it blatantly misrepresents to the Court that the bids were final and that they were "rejected."

The Burack bid is clearly not an appropriate basis for an evaluation. That bid was tainted from its initiation by contacts from Plaintiffs' counsel, Lynda Grant, to Burack representatives.[4] Burack is a "periodic" client of Grant's firm. *Grant Deposition*, at 74. It is impossible to say that

---

**3.** The Plaintiffs' argument that *no one* in this case has provided an independent appraisal of the properties is not helpful. The General Partners' internal valuations were not intended to reflect accurately and objectively the market value of the properties. If the Plaintiffs wanted to assess damages based on that value, it was their burden to make the appropriate calculation or find someone who can.

**4.** The Court notes that the pending motion to decertify the class in this suit based on attorney misconduct is rendered moot by this motion. The Court observes however, that it would be well within the law to grant the motion, based either on the egregious misconduct of Plaintiffs' counsel, *see Wyle v. R.J. Reynolds Indus., Inc.*, 709 F.2d 585, 590–91

(9th Cir.1983) (affirming dismissal of action for attorney deception), or on the failure of Plaintiffs' counsel to notice the proposed class until two months before trial of this nearly three-year-old case. *See Home–Stake Prod. Co. Securities Litigation*, 76 F.R.D. 351, 380 (N.D.Okla.1977) (class notice must be distributed at earliest possible time). The Plaintiffs' representation that local counsel are qualified to take this case over is both questionable and irrelevant. Plaintiffs' recent motions have suggested that such an eventuality will result in a significant delay of a case that has already outlived its welcome. Moreover, that representation does not address the Plaintiffs' inexcusable delay in seeking notice of the class.

Burack's bid of $98,000,000 is a true reflection of the properties' values. At the most, it would seem to the Court to be a reflection of the value Plaintiffs' counsel placed on this case, or the amount counsel believed would induce this Court to grant a preliminary injunction stopping the AIP merger. Apparently, Kroboth understood that Grant's involvement called the legitimacy of the competitive "bids" into question, *see Kroboth Deposition,* at 150, but did not factor the involvement into his damages calculations. Moreover, the Burack bid was withdrawn, or lapsed, after Burack representatives refused to sign a confidentiality agreement that, in part, asked them to represent that information obtained as a result of negotiations would not be used in the pending litigation surrounding the merger—this very lawsuit.

For similar reasons, the Glenborough bid, in the Court's view, does not provide a reliable assessment of the partnerships' pre-merger value. As is well known by all concerned, that bid is also tainted with suggestions of attorney misconduct. The evidence before the Court suggests that Grant at least encouraged the Glenborough bid, both directly and through Glenborough's real estate broker, The Koll Company.

The Court is aware that there is no evidence of involvement by Grant in the very first Glenborough expression of interest in the partnerships. That initial expression of interest took place in July 1997; Grant apparently contacted Glenborough, through Koll, in September.[5] However, the $95,000,000 figure, which is what Glenborough offered Realco in September, was apparently an amount suggested by Grant, through the Koll representative. The Court knows of no support for finding that a valuation made for the purpose of furthering a preliminary injunction proceeding is reliable.

The Court acknowledges that in June 1997, before there is any evidence of a Grant connection, Glenborough mentioned $75 per square foot as a real estate value for the properties. Glenborough's final bid amounts to a figure just short of that amount. However, the Court finds that the figure is unreliable. First, as the June letter makes clear, it is based only on the 1996 valuation of two of the partnerships, USAA III and USAA IV. In addition, the letter notes that the figure, particularly as it pertained to those figures was, according to a USAA officer, "conservative."

Moreover, Kroboth' s reliance on the $95,000,000 bid fails to take several factors into account: first, the Glenborough bid, even if legitimate, was in its earliest stages. Due diligence had not been performed, and its performance would occur at some cost to the partnerships. In addition, and more importantly, the offer was conditional, requiring that the properties be transferred free of all encumbrances. This condition obviously lessened the value of the bid, but it is not clear that this condition was taken into account in Kroboth's valuations.

Finally, the Glenborough bid, like the Burack bid, was withdrawn. While the Plaintiffs contend that the bid was withdrawn due to hostility from the General Partners and that this hostility violated the General Partners' fiduciary duties to the Limited Partners, there is absolutely no evidence in this record of such hostility.

**5.** Interestingly, the record suggests that a *Limited Partner* had some part in the Glenborough expression of interest, however. *See Letter from Ray Wirta* (President of Koll and Limited Partner in USAA Income Properties III and IV) (encouraging Realco representative to consider Glenborough offer (which Koll had solicited) in part to avoid "inevitable litigation" resulting from the proposed merger).

The General Partners did initially rebuff the Glenborough offer, but later changed its position and invited Glenborough to begin negotiations. The Defendants in this case did depose Glenborough representatives when faced with a motion for a preliminary injunction enjoining them from proceeding with the merger, but, in light of Glenborough's contacts with Lynda Grant, it is surprising to this Court that the deposition notices were unexpected. They were certainly not unwarranted. In the absence of evidence that the General Partners' treatment of Glenborough violated fiduciary duties owed the Limited Partners, the most that can be said of the Glenborough offer is that it was preliminary, conditional, tainted by attorney misconduct, and based on conservative and perhaps outdated property valuations. This is hardly sufficient to pass any measure of reliability imposed by *Daubert* and its progeny.

Moreover, Kroboth's assumption that the competing bids can be relied upon as "minimum values" for each property simply because they were rejected as too low is flawed. *See Kroboth Report*, at 5. First, the bids were not "rejected." Burack's bid was withdrawn, as was Glenborough's. Second, the assessment that the bids did not provide the Limited Partners all the benefits of the AIP merger was more complicated than a mere assessment that they were too "low." Instead, that assessment reflected an examination of the relative values of the *transactions* — a sale rather than the roll up.

### Prudential Fairness Opinion

Kroboth's valuation is not unreliable to the extent that it drew from the Prudential Securities Fairness Opinion. In that opinion, Prudential determined fairness by finding the relative value of AIP by com-

paring it to six similar companies and the relative fairness of the agreement by looking at eleven similar transactions deemed to be comparable to the merger. Comparing similar companies is an accepted method of valuation. *Indian Coffee Corp. v. Procter & Gamble*, 752 F.2d 891, 897 (3d Cir.1985). To the extent that Kroboth's opinion does not reflect considerations that may alter the picture presented in the Prudential opinion, the Court finds this question goes to the weight of Kroboth's opinion rather than its admissibility.

On the other hand, the Court can find no support, either in the cases or in Kroboth's expert report, for averaging the high and low valuation figures represented in the Prudential opinion. The Court finds that the Plaintiffs are attempting to invade the province of the jury when doing so. Had this case gone to trial, the Plaintiffs would have been required to prove that their damages were at the high end of the range, at the low end, or somewhere in the middle through competent evidence that took various factors affecting value into account.[6]

### VALUE OF AIP STOCK

■ Kroboth's valuation of AIP stock is even more seriously flawed than his valuation of the partnerships' properties. Kroboth argues that the value of the stock must be discounted to take into account the depressing effect a flood of AIP stock on the market would have on individual share prices. This is referred to as a "blockage discount." *See Rushton v. Commissioner*, 498 F.2d 88, 89 (5th Cir.1974) (discussing theory). In Kroboth's view, this discount must be applied because the Limited Partners, needing to dispose of their AIP stock within a short period of time, would flood the market, making it

---

**6.** No such evidence is in the record before the Court, however.

difficult to sell the stock and resulting in a decreased per-share value.

Kroboth reasons that the Limited Partners would be compelled to sell their AIP stock immediately following the merger in order to address tax concerns. As Kroboth points out, the merger increased the taxable investment base for the partners and provided no funds to compensate for the increased liability. Kroboth reasons from these facts that a "majority" of Limited Partners would need to dispose of their stock "shortly after the closing of the Merger." *Kroboth Report,* at 20. This analysis is worse than speculative; it is completely unfounded and is utilized, the Court finds, in order to meet the requirement, necessary to the application of the blockage discount, that there be a need to liquidate the block of shares within a reasonable time.[7] First, there is simply no evidence that Limited Partners would need to, or want to, sell their AIP stock to address tax concerns.[8] Kroboth's assumption that they would not or could not use other funds is wholly unsupported.

Second, the Court notes that the Merger was consummated in January 1998, the beginning of a new tax year, giving the Limited Partners a year and a half to accommodate their increased tax burden. The Court does not believe this is the sort of time constraint that would support the application of a blockage theory.[9]

## ACCOUNTING CLAIM

■ Remaining to be considered is Plaintiffs' request for the equitable remedy of an accounting. The Court finds the remedy inappropriate in this case.

First, the Court recognizes that an accounting is an extraordinary remedy and should be given only where there is no adequate remedy at law. *See Dairy Queen, Inc. v. Wood,* 369 U.S. 469, 478, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962); *Stockton v. Altman,* 432 F.2d 946, 950 (5th Cir.1970), *cert. denied,* 401 U.S. 994, 91 S.Ct. 1232, 28 L.Ed.2d 532 (1971). A court has broad discretion to determine whether an accounting is appropriate. *First Commodity Traders, Inc. v. Heinold Commodities, Inc.,* 766 F.2d 1007, 1010 (7th Cir.1985). The Court believes that an adequate remedy at law, and a more appropriate remedy, was available to Plaintiffs—a suit for damages. That Plaintiffs failed to prove such damages sufficient to survive summary judgment does not suggest that the remedy was not available, only that they failed to properly pursue it.

In addition, and for similar reasons, the Court finds that this suit is not amenable to the remedy of an accounting. The Unit-

---

7. For similar reasons, the Court agrees with the Defendants that the assumption of aggregation in this case is unfounded. While the Court will not go into the various arguments regarding whether blockage can apply *only* where there is a block of stock being conveyed, the Court finds that under these facts, aggregation is inappropriate. This is so because it assumes that the 18,081 individual shareholders who received stock in this transaction would act in concert, thus causing a blockage. There is simply no basis for this assumption.

8. The evidence before the Court, in fact, is that the burden was not significant and could be easily taken up by the Plaintiffs in this case. Dr. Heller, for example, testified that his net worth was about $10 million.

9. Plaintiffs' novel proposition that their blockage theory was "tested" by the events that form the basis for this lawsuit is not persuasive. While there is evidence that AIP stock price did decline shortly after the merger, the evidence is that the decline was brief and, more significantly, that it mirrored the decline of similar REIT share prices. Even if this were not the case, however, the Court will not rely upon an analysis that a first-year philosophy student would recognize as flawed.

ed States Supreme Court has held that an accounting to shareholders claiming misrepresentations in a merger may be appropriate where the "defect in the proxy solicitation relates to the specific terms of the merger ... *to ensure that the shareholders receive the value that was represented as coming to them.*" *Mills v. Electric Auto–Lite Co.,* 396 U.S. 375, 388, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970) (emphasis added). Where the claim is that the merger resulted in a reduction of earnings or earnings potential, monetary damages are appropriate. *Id.* The Court finds that Plaintiffs here are making a claim that is more like the latter than like the former. The damages calculations put forth by Kroboth demonstrate that the Plaintiffs simply believe that they got a bad deal. Plaintiffs have brought forth no evidence that an accounting, by itself, could remedy their alleged damages. The only possibly relevant case they cite to support their claim that this case is amenable to an accounting is *Schreiber v. Hadson Petroleum Corp.,* 1986 WL 12169 (Del.Ch.1986). That case provides slim support. First, it is a case dealing almost exclusively with the merits of a settlement agreement reached by the parties. Second, it does not support the claim that any breach of fiduciary claim can be afforded an accounting remedy. The court in that case notes specifically that the plaintiffs before it "disputed the accountings of the assets of the limited partnerships." *Schreiber,* 1986 WL 12169, at *2. The Court is not convinced that this is the crux of the Plaintiffs' claims here. To the extent that it is, the Court finds that the Plaintiffs have ratified the accountings present in the proxy materials.

The Court acknowledges that at least two of the relevant partnership statutes governing this case provide limited partners the remedy of accounting upon dissolution of the partnership. However, the Court agrees with Defendants that the Plaintiffs here have ratified any conduct that might appropriately be remedied by an accounting. To the extent that the Plaintiffs claim that their properties were undervalued in the transaction, the Court notes that a majority of the shareholders ratified the apparent value placed on the properties. While Plaintiffs claim that internal valuations placed on the properties constitute a material misrepresentation in this case, the Court has already stated that those valuations are unreliable and arguably biased, and therefore not material. The proxy materials set forth the procedure used by Houlihan and Prudential in assessing the transaction value, compare the merger with the option of liquidation, and provide the estimated per-unit value of the assets. Significantly, the proxy materials also provide cautionary language that the values assigned by Houlihan may not accurately reflect the asset values because the assigned values were "the result of negotiations between the common management [of AIP] and the General Partners." Finally, the Limited Partners were given Dissenters' Rights to challenge the value received.

If the claimed right to an accounting is based on the alleged "bids" by Burack and Glenborough, for reasons discussed above, the Court finds that any omissions in that regard were immaterial. First, the Court notes that the proxy materials did apprize the partners of expressions of interest by Burack and Glenborough. The actual amount of those offers is, in the Court's view, unreliable and therefore immaterial. Houlihan's October 1997 assessment that the Glenborough offer might be better than the proposed merger is immaterial because it is supplanted by a December opinion that the merger, in fact, provided more benefits to the Limited Partners. Moreover, the Glenborough and Burack bids were withdrawn.

To the extent that Plaintiffs believe they are entitled to an accounting based on

misrepresentations or omissions regarding the value of AIP post-merger stock, the Court also, for reasons discussed more fully above, disagrees. There is no credible, admissible evidence that the AIP stock was worth less than its assessed value; therefore any omission regarding "blockage" was not material.

Finally, the merger at issue here without a doubt benefitted the General Partners and AIP. However, the proxy materials clearly and unequivocally disclose all the interests at stake; the Limited Partners were not misled about the General Partners' interest in this transaction.

For these reasons, the Court finds that an accounting is an inappropriate remedy in this case. Obviously, to the extent that a *Revlon*-type duty to auction existed here, an accounting would be a wholly inadequate remedy.[10] Accordingly, the request for an accounting is denied.

### CONCLUSION

The motions for summary judgment are GRANTED, and this case is DISMISSED. All pending motions, are DENIED AS MOOT.[11] Remaining for the Court's consideration is Defendants' request for sanctions, which the Defendants are invited to reurge.

---

10. As this discussion indicates, had the Court addressed the substantive question of whether material misrepresentations were made in the proxy materials, that question would almost certainly have been resolved in favor of the Defendants. Moreover, on the fiduciary duty/*Revlon* questions, the evidence strongly suggests that the Limited Partners ratified the General Partners' conduct in the roll-up transaction. Such ratification reduces the level of scrutiny a court must give such a transaction to a determination that the actors used good business judgment. *See In re General Motors Class H Shareholders Litigation,* 734 A.2d 611, 616 (Del.Ch.1999) (ratification reduces scrutiny to business judgment standard). The roll-up at issue here would, in all likelihood, have survived such scrutiny.

11. Defendant AIP has recently filed a *Daubert* motion based on the qualifications of Kroboth. The arguments in that motion are identical to those put forth in both summary judgment motions, to which Plaintiffs have had the opportunity to respond. Accordingly, the *Daubert* motion is resolved by this Order.